IN THE

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

———————————

No. 09-2303

———————————

ERIC LYNN

Appellee

v.

EDWARD TARNEY, et al.,

Appellants

———————————

On Appeal From the United States District Court for the District of Maryland
(Peter J. Messitte, Judge)

———————————

**BRIEF OF APPELLANTS**

———————————

<table>
<tr><td>Marc P. Hansen<br>Acting County Attorney</td><td>Silvia C. Kinch<br>Associate County Attorney</td></tr>
<tr><td>Patricia P.Via, Chief<br>Division of Litigation</td><td>Executive Office Building<br>101 Monroe Street, Third Floor<br>Rockville, Maryland 20850</td></tr>
<tr><td>Edward B. Lattner, Chief<br>Div. of Human Resources & Appeals</td><td>(240) 777-6700<br>Attorneys for Appellants</td></tr>
</table>

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENTS

TABLE OF AUTHORITIES ................................................................... ii

STATEMENT OF JURISDICTION ....................................................1

STATEMENT OF THE ISSUES ........................................................1

STATEMENT OF THE CASE ...........................................................2

STATEMENT OF FACTS ................................................................3

SUMMARY OF THE ARGUMENT ...................................................11

ARGUMENT

Standard of Review ......................................................................12

I.     The Appellant police officers provided the appropriate impeachment/ exculpatory information to the prosecutor and did not violate Lynn's due process right under the *Brady* doctrine. ..................................................13

II.     The Appellant police officers are entitled to qualified immunity because the law regarding a police officer's duty under the *Brady* doctrine was not clearly established such that they knew or should have known that their conduct violated Mr. Lynn's constitutional right under the Fourteenth Amendment. ..................................................................22

CONCLUSION ..............................................................................30

CERTIFICATE OF COMPLIANCE

COPY OF UNREPORTED CASE – *Walker v. Sopher*, 1998 U.S. App. LEXIS 23712 (4th Cir. 1998)

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Albright v. Oliver*, 510 U.S. 266 (1994) ...........................................................26, 27

*Arizona v. Youngblood*, 488 U.S. 51 (1988) .....................................................20, 21

*Barbee v. Warden*, 331 F.2d 842 (4th Cir. 1964). .............................................14, 27

*Bloodsworth v. State*, 76 Md. App. 23, 543 A.2d 382 (1988) ...............................17

*Brady v. Dill,* 187 F.3d 104 (1st Cir. 1999)…………………………………….......28

*Brady v. Maryland,* 373 U.S. 83 (1963) ........................................................passim

*DeLuca v. State*, 78 Md. App. 395, 553 A.2d 730, (1989).....................................17

*DiMeglio v. Haines*, 45 F.3d 790 (4th Cir. 1995).......................................23, 24, 27

*Giglio v. United States*, 405 U.S. 150 (1972) .........................................................14

*Gooden v. Howard Co.*, 954 F.2d 960 (4th Cir. 1992)............................................24

*Goodwin v. Metts*, 885 F.2d 157 (4th Cir. 1989) .......................................25, 26, 27

*Groh v. Ramirez*, 540 U.S. 551 (2004) ...................................................................23

*Haley v. City of Boston,* 2009 U.S. Dist. LEXIS 121565 (D. Mass. December 31, 2009)…………………………………………………………………………………29

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982)............................................................23

*Henry v. Purnell*, 501 F.3d 374 (4th Cir. 2007)...................................................1, 13

*Jean v. Collins (Jean II)*, 221 F.3d 656 (4th Cir. 2000)....... 19, 20, 21, 22, 27, 28, 29

*Jean v. Rice*, 945 F.2d 82 (4th Cir. 1991) ...............................................................19

*Kyles v. Whitley*, 514 U.S. 419 (1995)..............................................................14, 20

*Maciariello v. Sumner*, 973 F.2d 295 (4th Cir. 1992)……………………………….23

*McMillian v. Johnson*, 88 F.3d 1554 (11th Cir. 1996)…………………………..28

*Mitchell v. Forsyth*, 472 U.S. 511 (1985) ………………………………………1, 23

*Pearson v. Callahan*, 555 U.S. ___, 129 S. Ct. 808 (2009) ......................12, 23, 24

*Porter v. White,* 483 F.3d 1294 (11th Cir. 2007) …………………………………28

*Saucier v. Katz*, 533 U.S. 194 (2001) …………………………………………12, 24, 25

*Sevigny v. Dicksey*, 846 F.2d 953 (4th Cir. 1988)…………………………………26

*Strickler v. Greene*, 527 U.S. 263 (1999) ………………………………………13

*Torchinsky v. Siwinski*, 942 F.2d 257 (4th Cir. 1991) ………………………………23

*United States v. Agurs*, 427 U.S. 97 (1976)………………………………………13

*United States v. Bagley*, 473 U.S. 667 (1985) ………………………………………13

*United States v. Jeffers*, 570 F.3d 557 (4th Cir. 2009) ……………………………16

*United States v. Smith Grading & Paving, Inc*., 760 F.2d 527 (4th Cir. 1985)…...17

*United States v. Wilson*, 901 F.2d 378 (4th Cir. 1990)……………………………16, 17

*Vathekan v. Prince George's County*, 154 F.3d 173 (4th Cir. 1998) ......................24

*Walker v. City of New York,* 974 F.2d 293 (2nd Cir. 1992)………………………..28

*Walker v. Sopher*, 1998 U.S. App. LEXIS 23712 (4th Cir. 1998)
(copy attached)......................................................................................26, 27, 28

*Wiley v. Doory*, 14 F.3d 993 (4th Cir. 1994)………………………………………24

*Williams v. State*, 183 Md. App. 517, 962 A.2d 440 (2008) ...................................17

*Wilson v. Kittoe*, 337 F.3d 392 (4th Cir. 2003) .......................................................12

*Wilson v. Layne*, 141 F.3d 111 (4th Cir. 1998), *aff'd*, 526 U.S. 603 (1999) ......23, 29

**Constitutional Provisions, Statutes, Ordinances, Rules, and Regulations**

**Statutes**

28 U.S.C. § 1291......................................................................................................1

28 U.S.C. § 1343......................................................................................................1

42 U.S.C. § 1983......................................................................................................1

## STATEMENT OF JURISDICTION

This action involves a complaint by Appellee, Eric Lynn, alleging a violation of his constitutional right to due process under *Brady v. Maryland*, 373 U.S. 83 (1963), arising out of the alleged withholding of evidence by Appellant police officers. Subject matter jurisdiction in the District Court over the constitutional claims was founded upon 28 U.S.C. § 1343 and 42 U.S.C. § 1983.

By order dated October 20, 2009, the United States District Court for the District of Maryland denied qualified immunity to the Appellant police officers in their individual capacities on a motion for summary judgment. Appellants timely appealed on November 16, 2009. This Court has jurisdiction based upon 28 U.S.C. § 1291 and the collateral order doctrine as construed by the United States Supreme Court in *Mitchell v. Forsyth*, 472 U.S. 511, 524-25 (1985). *See also Henry v. Purnell*, 501 F.3d 374, 376 (4th Cir. 2007).

## STATEMENT OF THE ISSUES

I.   Whether the Appellant police officers provided the appropriate impeachment/exculpatory information to the prosecutor and did not violate Lynn's due process rights under the *Brady* doctrine.

II.   Whether the Appellant police officers are entitled to qualified immunity because the law regarding a police officer's duty under the *Brady* doctrine was not clearly established such that the officers knew or should have known that their conduct violated Mr. Lynn's constitutional right under the Fourteenth Amendment.

## STATEMENT OF THE CASE

This action arises out of the arrest, conviction, post-trial conviction relief, and subsequent acquittal of Appellee, Eric D. Lynn.   On August 25, 2008, Appellee filed suit against Appellants Edward Tarney, Richard Fallin, Russell Hamill, and William Whalen in the Circuit Court for Prince George's County, Maryland. (Joint Appendix (J.A.) at 14.)  After service was made on Appellants, the case was removed to the United States District Court for the District of Maryland.   Appellee Lynn alleged that Tarney, Fallin, Hamill and Whalen, all Montgomery County police officers, violated his constitutional rights when they wrongfully arrested him and accused him of committing a homicide in Montgomery County, Maryland, that resulted in his incarceration.  (J.A. at 14-16.)

Lynn's original suit contained several claims for federal constitutional violations under 42 U.S.C. § 1983 against Appellants, including claims for a deprivation of due process (a *Brady* violation) (count 1), malicious prosecution (count 2), and unconstitutional search and seizure (count 3).   In addition, the complaint contained two state tort claims: one for malicious prosecution (count 4) and the other for false arrest/false imprisonment (count 5).  Finally, the complaint alleged state constitutional claims for violation of due process and unlawful search and seizure under Articles 24 and 26 of the Maryland Declaration of Rights (count 6).  Appellants filed a motion to dismiss which Lynn opposed.  The district court

heard oral argument on that motion and dismissed all counts except for Count 1, the claim for violation of due process under 42 U.S.C. § 1983 based on a *Brady v. Maryland* violation. The basis of this claim was the alleged failure on the part of the police officers to disclose potential impeachment information to Mr. Lynn before his first criminal trial. (J.A. at 14.)

After the parties completed discovery, Appellants filed a motion for summary judgment regarding the sole remaining count asserting that they did not violate Lynn's due process rights and that they were entitled to qualified immunity. (J.A. at 30.) Lynn opposed that motion. (J.A. at 189.) After a hearing on the motion, the district court declined to grant qualified immunity to Appellants and denied the motion for summary judgment on the remaining count. The court explained that "assuming there is a *Brady* obligation at all, that this is arguably, fairly arguable to be *Brady* information that was not disclosed." (J.A. at 1033.)

The court held that qualified immunity did not apply and that "negligence justifies this case going forward here, but there is [sic] allegations of willful withholding." (J.A. at 1035-1036.) From this judgment, the Appellants timely appealed.

## STATEMENT OF FACTS

For three years prior to the shooting which led to Mr. Lynn's arrest, an informant named Sandy worked for the Montgomery County Police Department as

a confidential paid informant and had provided information on drug cases to narcotics detectives Russell Hamill and William Whelan. (J.A. at 17, 37, 93-102.) Sandy was paid with funds from the Montgomery County Police Department Drug Enforcement Fund, which was a fund used only for drug information and related work provided by the informants for drug cases. (J.A. at 140-141.) The detectives in the narcotics unit had a procedure for requesting money to pay an informant, which required the detective to review the past work done by the informant and then submit a request for a certain amount of money to be paid to the informant in the future over a period of time and usually in increments. (J.A. at 139-141.)

On May 25, 1994, Ephraim Hobson was shot while in his apartment located at 9312 Piney Branch Road, Apartment No. 205, and Silver Spring, Maryland. Mr. Hobson later died from his wounds. (J.A. at 16.) Edward Tarney and Richard Fallin, then Montgomery County Police homicide detectives, were assigned to investigate the case. (J.A. at 16.) Shortly after the shooting, Sandy contacted Detective Hamill, then a Montgomery County Police narcotics detective, and advised him that she had witnessed the Hobson shooting. (J.A. at 78-79, 103, 106.) Hamill forwarded Sandy's eye-witness information to the homicide detectives for follow-up. (J.A. at 79.)

Detectives Tarney and Fallin met with Sandy on several occasions as part of the homicide investigation. Sandy provided descriptions of two people involved in

the shooting. (J.A. at 109-111.) Sandy knew one man as "Eric" and provided a physical description of him that included a detailed description of his clothing and the fact that he frequented a certain drug area in Langley Park. (J.A. at 110.)

On May 30, 1994, the homicide detectives had Sandy look at some photographs, at which time she identified the person she knew as "Eric." (J.A. at 117-118.) She indicated that she was "90 percent sure it's him." (J.A. at 112-113, 119.) At a later date, Sandy was taken for a "roving show up procedure" where she saw Eric Lynn in person and identified him as the suspect named "Eric." (J.A. at 20, 119-124.) On June 27, 1994, Detective Tarney arrested Lynn at his home in Landover, Maryland, and then searched the home pursuant to the arrest and search warrants he had previously obtained. (J.A. at 21, 125-126.)

Prior to Sandy providing information about the Hobson murder, the police had received approval in July 1993 for $700 in funds to pay her for work she had done on narcotics cases between March and April 1993. Sandy was paid varying amounts through May 24, 1994, for that prior drug work. (J.A. at 141-142.) Sandy performed additional work from approximately November 1993 through January 1994 for the narcotics detectives before she became a witness in the Hobson murder case. In accordance with police practices, requests for money to pay Sandy for those services were made on or about June 10, 1994 ($50 request) and June 17, 1994 ($1,250 request of which $1,000 was approved). Sandy was then paid in

increments between June 21, 1994 and December 6, 1994.  (J.A. at 140-141.)  In

December 1994, Hamill had been promoted and was leaving the unit.  He

requested the remaining balance of $500 as final payment to Sandy to close out his

dealings with her as a confidential paid informant.  (J.A. at 141.)  Through this

system, Sandy was paid before and after she became a witness in the murder

investigation, but the payments were only for work she performed for the narcotics

officers.  (J.A. at 144.)

        Notwithstanding the drug information payments, during the murder

investigation, Sandy was not paid by the police or anyone for her information in

the murder case or for her cooperation.  In fact, she was told by Hamill that she

would not be paid for any information in the murder investigation.  (J.A. at 90.)

She also was told by the then-Assistant State's Attorney (ASA) John McCarthy

that she would not be paid for her cooperation as a witness in the murder

investigation.  (J.A. at 53, 61-62.)

        The prosecutor in the criminal case, David Boynton, knew that Sandy was a

confidential paid police informant, having been advised of her status by the police

detectives during the murder investigation and while preparing for the Hobson

murder trial.  (J.A. at 47, 137-138.)  Although he did not know about the detailed

inner workings of the relationships between narcotic informants and narcotic

detectives, the prosecutor knew that those informants generally did not testify in

narcotic prosecutions so that the secrecy of the informant could be maintained. The prosecutor learned about Sandy and her role as an informant in drug cases because she was now a witness in a murder case. Mr. Boynton knew that Detectives Hamill and Whalen were in the narcotics section, and that they were the officers who had worked with Sandy on the narcotics cases. (J.A. at 46-47.)

Mr. Boynton was also aware that Sandy had solicited payments from the police during the homicide case for her cooperation in that case. (J.A. at 47-48.) In September 1994, prior to the first trial, Mr. Boynton spoke by telephone to Detective Tarney about the fact that Sandy had gotten "ticked off" and that when she asked for money, she was told "no" by then-ASA John McCarthy. (J.A. at 48-55.) Mr. Boynton knew from this conversation that Sandy was angry the day the grand jury met. (J.A. at 57-58.) Although Mr. Boynton knew that Sandy had asked for money during the homicide investigation, he did not advise the defense attorney of this because he did not think it was exculpatory and thus not relevant. While Mr. Boynton knew that Sandy was not getting any money for the information regarding the murder investigation, Detective Tarney told him that Detective Hamill was giving Sandy money from time to time to make her happy for giving drug information to the police and that she was paid when "she needed it." (J.A. at 55-56, 64, 71-72.) Although he did not know the exact timing of the payments and never asked Detective Hamill about the payments, based on his

conversation with Detective Tarney, Mr. Boynton knew that Detective Hamill was the one that paid Sandy on a regular basis. (J.A. at 59, 65-66, 73-74.) [1]

Mr. Lynn's defense counsel, David Simpson, Esquire, was told that Sandy was a confidential paid police informant before a status conference relating to the first murder trial. (J.A. at 67-68, 77.) Mr. Simpson contacted Detective Tarney before the first trial, and Tarney was very helpful in providing information about the procedures used for the identification of Lynn as a suspect. (J.A. at 156.) Simpson also was given an open file by the State's Attorney's Office. (J.A. at 156-157.) He arranged to meet and interview Sandy prior to the trial to get whatever information he needed from her. (J.A. at 157.) Although Simpson stated that he believed the State had a duty to provide him with the identity of the witness, he did not file any motion to compel disclosure. Instead, he was given the opportunity to meet the informant, to interview her, and to obtain any information he wanted from her. (J.A. at 68-71, 77, 158-160.) He was advised that Sandy was a paid informant for the police, that she had a prior conviction for theft, and that there was "something about drugs." (J.A. at 162-163, 165.) Based on this information, Simpson was prepared to ask Sandy about any bias she may have had as a result of

---

[1] It appears that the payments in question here were made coincidentally during the homicide investigation and prosecution, but at that time, Mr. Boynton did not know which narcotics cases Sandy was being paid for nor did he ask the detectives for that information. (J.A. at 65-66.)

8

being paid. (J.A. 163-164.) Certainly, he would have been able to ask her about any payments, the amounts, the dates, and the purpose for each.

There were several attempts for Mr. Simpson to meet with Sandy before the trial, and because of his "very tight calendar," Mr. Simpson was unable to schedule a meeting with Sandy prior to the suppression hearing. (J.A. at 167-169.) Mr. Simpson agreed to talk to Sandy right before the suppression hearing, which was held on the same day as the trial. Sandy was late that day, so Simpson could not talk to her before the hearing. (J.A. at 169-170.) He chose not to file any motions about disclosure or seek any continuance of the trial. (J.A. at 169, 171-172.) Instead, it was agreed that he would be permitted to talk Sandy before the trial if he needed. (J.A. at 169-170.)

At that suppression hearing, although Sandy admitted that she was a paid informant, Mr. Simpson did not ask her anything about the payments she received or the cases she worked on for the police. (J.A. at 173-174, 177.) He also questioned Detective Hamill at the hearing about the fact that Sandy was a paid informant. Although given the opportunity, Mr. Simpson never asked about the type of cases for which Sandy was paid, when the payments were made, or how much the payments were. (J.A. at 173-174.) Based on the information he received from Sandy at the suppression hearing, Simpson decided he did not need to talk to her further, nor did he think he needed to do any further investigation of Sandy.

At Lynn's non-jury criminal trial in November 1994 before the Honorable L. Leonard Rubin, the prosecutor called Detectives Hamill, Fallin, and Tarney as witnesses. During questioning, Detective Hamill was asked whether Sandy had ever been paid for her cooperation in the murder investigation, and he testified that Sandy was not paid for her cooperation in the murder case. (J.A. 241-242.) Sandy also testified and denied being paid for cooperation in the murder case, but she did testify that she was a paid informant for the police and had worked with Detective Hamill for over three years. (J.A. at 22, 130-132, 134.)

At the conclusion of the bench trial, Mr. Lynn was convicted of first degree murder and use of a firearm in a crime of violence. He received a life sentence for the murder charge and a concurrent fifteen year sentence for the handgun charge. (J.A. at 22-23, 127.) Lynn obtained new legal counsel and filed a petition for post-conviction relief, which was granted based on ineffective assistance of counsel and a new trial was ordered. (J.A. at 23.) Before the second trial began, Lynn's defense counsel obtained additional information about Sandy with regard to the payments made to her by the police both before and after she became a witness in the murder case. (J.A. at 14.) A second trial was conducted between October 24 and 31, 2007, and Lynn was acquitted by a jury. (J.A. at 24.)

## SUMMARY OF THE ARGUMENT

Appellants Hamill, Whalen, Fallin, and Tarney did not violate Eric Lynn's right to due process under the *Brady* doctrine by withholding impeachment or exculpatory information prior to his first criminal trial. Rather, they met any obligation they had when they informed the prosecutor of Sandy and her status as a confidential paid informant who worked for the narcotics detectives for three years. The prosecutor knew there was a history of payments to Sandy, knew she was paid by the narcotics officers for her drug information, and knew that her status with the narcotics detectives did not change while she was a witness in the murder case. Furthermore, the criminal defense was made aware of Sandy's status as a confidential paid informant prior to the start of Lynn's first criminal trial and did not seek any additional discovery from the State, request a continuance to investigate further, or make inquiry of Sandy on cross-examination even though he had the opportunity to do so. There is no evidence to establish that Appellants willfully withheld any *Brady* information from the prosecutor. Instead, they reasonably relied on the prosecutor's knowledge to ensure that the criminal defense had the relevant and material information about the confidential paid informant. Thus, there can be no *Brady* violation on the part of the Appellant police officers.

Furthermore, the law in 1994 was not clearly established to provide the Appellant police officers with sufficient knowledge that they were required to

provide the prosecutor with the specific payment history of the confidential paid informant.  Even if the law in 1994 established some duty for police officers to provide exculpatory and impeachment information to the prosecution, it was a generalized duty and the parameters of that duty were not clearly established at that time such that Appellants knew or should have known that they were violating Lynn's constitutional rights.

## ARGUMENT

### Standard of Review

The issue presented to this Court involves a review of the district court's denial of qualified immunity to law enforcement officers alleged to have violated the constitutional rights of a citizen.  The district court's denial of qualified immunity is reviewed *de novo*.  *Wilson v. Kittoe*, 337 F.3d 392, 397 (4th Cir. 2003).  When deciding whether a government official is entitled to qualified immunity, a court may utilize the two-step sequence enunciated in *Saucier v. Katz*, 533 U.S. 194 (2001), or begin and end with the determination of whether a right has been established.  *Pearson v. Callahan*, 555 U.S. __, 129 S. Ct. 808, 818 (2009).  The two-step process may be appropriate where, as here, "a discussion of why the relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional violation at all."  *Id.*  Appellee bears the burden of proving that a constitutional violation occurred.

*Henry v. Purnell*, 501 F.3d at 377-78. Appellants bear the burden of demonstrating that they are entitled to qualified immunity. *Id.* at 378.

**I.   The Appellant police officers provided the appropriate impeachment/exculpatory information to the prosecutor and did not violate Lynn's due process rights under the *Brady* doctrine.**

The United States Supreme Court in *Brady v. Maryland*, 373 U.S. 83 (1963), held that the Due Process Clause of the United States Constitution imposes upon the State a duty and obligation to disclose "evidence favorable to an accused upon request . . . where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. The Supreme Court later defined material evidence as evidence where "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 676, 682 (1985).

"There are three components of a true *Brady* violation: [t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). The *Brady* duty applies to the State, even in the event that exculpatory or impeachable evidence is not requested by the defense. *United States v. Agurs*, 427 U.S. 97, 107 (1976).

The analysis in this case begins with what duty, if any, is attributable to a police officer under the *Brady* doctrine. Generally, it is the prosecutor's duty to "learn of any favorable evidence known to others acting on the government's behalf in the case, including the police" *Kyles* v. *Whitley*, 514 U.S. 419, 437 (1995). It is also the prosecutor who has the duty to provide the impeachment and exculpatory information to defense counsel. *See Barbee v. Warden*, 331 F.2d 842, 846 (4th Cir. 1964) ("The duty to disclose is that of the state, which ordinarily acts through the prosecuting attorney"). This duty affects the prosecutor trying the case as well as other members of the prosecutor's office, and requires large prosecutorial offices to establish "procedures and regulations . . . to insure communication of all relevant information on each case to every lawyer who deals with it." *Giglio v. United States*, 405 U.S. 150, 154 (1972).

The prosecutor has the sole responsibility to determine what information should be disclosed to defense counsel. *Kyles*, 514 U.S. at 419. "[W]hether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor. The prosecutor's office is an entity and as such it is the spokesman for the Government." *Giglio,* 405 U.S. at 154.

Here, the police officers disclosed to the prosecutor that Sandy, a witness to the Hobson murder, was a confidential paid informant for the police, that she worked for the narcotics detectives for a significant period, and that she was paid

14

for information relating to narcotics cases.    The prosecutor knew all this information during the murder investigation and while preparing for the murder trial.  (J.A. at 46-47.)  And he certainly knew that drug informants did not testify in narcotic prosecutions and their identities were generally kept secret.  On the other hand, he also understood the close working relationship between Sandy and Detectives Hamill and Whalen.  He knew that Sandy dealt regularly with Hamill on the drug cases, and that the police had a process by which they paid her in those cases.  (J.A. at 46-47, 64.)

Further, based on what Detective Tarney told the prosecutor in September 1994, the prosecutor knew that Sandy had solicited payments from the police during the homicide case for her cooperation in that case.  (J.A. at 47-48.)  In that same conversation, Detective Tarney further advised the prosecutor that Sandy was paid by Detective Hamill for her work on drug cases, that Sandy "was getting money from time to time when she needed it," and that Hamill paid her from time to time to make her happy for giving drug information to the police.  (J.A. at 55-56, 64-66, 73-74.)[2]  Notwithstanding any amounts that Sandy may have been paid

---

[2] Subsequent to the first murder trial and after Lynn obtained post-conviction relief, Lynn's criminal defense lawyers filed a motion to dismiss the indictment for prosecutorial misconduct charging that Sandy was being paid for her cooperation in the murder case and that the prosecutor knew of this and suborned perjury in the original trial by allowing Sandy and the police detectives to testify that Sandy was not paid for her cooperation in the murder case.  Further, Lynn's attorneys, charged that even if the payments to Sandy were made in connection with narcotics cases

by Hamill for the drug information, the prosecutor learned from his conversation with Detective Tarney that Sandy was being uncooperative and was "ticked off" with Tarney because he did not pay her for her cooperation in the murder case. (J.A. at 48-55.)

Although the prosecutor knew that Sandy asked for money during the homicide investigation, he did not advise Lynn's defense counsel of this because he thought it was not exculpatory and did not need to be disclosed to the defense. (J.A. at 71-72, 77.) Moreover, there is no evidence to suggest that the prosecutor ensured that he had all the necessary information relevant to Sandy, including what the payment history was for her drug information. The prosecutor is the one charged with determining whether such information should have been turned over to the defense. The police officers had no input in this legal decision.

Moreover, the Fourth Circuit has held that, "[i]n situations such as this, where the exculpatory information is not only available to the defendant but also lies in a source where a reasonable defendant would have looked, a defendant is not entitled to the benefit of the Brady doctrine." *United States v. Wilson*, 901 F.2d 378, 381 (4th Cir. 1990); *see also United States v. Jeffers*, 570 F.3d 557, 573 (4th Cir. 2009) (quoting and relying on *Wilson*). In *Wilson*, the criminal defendant, on a collateral attack to his conviction, claimed that the government withheld

---

only, the State knew of such payments and failed to disclose that information to the defense. Lynn's motion was denied. (J.A. at 35-90, 412-499.)

favorable information when it failed to communicate to him a witness statement
which indicated that the defendant had been "set up" by framing him for an arms
exportation conviction.    In recognizing that the statement was suggestive  of a set-
up and could have helped the defendant in his case, this Court found no *Brady*
violation because Wilson was free to question the witness in preparation for trial.
The Court said:

> Indeed, given Wilson's awareness of Brill's closeness to Clines
> and given Wilson's belief that he was framed, it would have been
> natural for Wilson to have interviewed Brill in preparation for
> trial to determine if Brill could have supplied Wilson with
> exculpatory evidence.

*Id.* at 381.   Thus, " 'the *Brady* sin is hiding something and keeping it hidden.' "

*Williams v. State*, 183 Md. App. 517, 527, 962 A.2d 440, 445 (2008) (quoting

*DeLuca v. State*, 78 Md. App. 395, 424, 553 A.2d 730, 745(1989)).

Lynn's criminal defense attorney was informed before the first murder trial

that the key witness for the murder case was a confidential paid police informant.[3]

---

[3] Mr. Simpson testified at the ineffective assistance of counsel hearing that he did
not know Sandy was a confidential *paid* informant until the suppression hearing
which was held before the first criminal trial.  However, it is not disputed that
Lynn's criminal defense counsel knew of Sandy and her status by the time of the
pre-trial suppression hearing.   When potential exculpatory or impeachment
material is disclosed close to the trial it does not mean there has been a *Brady*
violation.  *Williams v. State*, 183 Md. App. 517, 526, 962 A.2d 440, 445 (2008),
quoting *Bloodsworth v. State*, 76 Md. App. 23, 43 n.16, 543 A.2d 382, 392 (1988)
(disclosure of exculpatory evidence 12 days before trial was not a suppression of
evidence under *Brady*).  *See also United States v. Smith Grading & Paving, Inc*.,
760 F.2d 527, 532 (4th Cir. 1985) (there is no *Brady* violation if the defense is

(J.A. at 67-68, 77.)  Based on this information, Mr. Simpson was prepared to ask Sandy about any bias she may have had as a result of being paid, which included the specifics of any payments she had received or was receiving.  (J.A. at 163-164.)  Yet Lynn claims that he was entitled to more than just the information that Sandy was a confidential paid informant who was working for the narcotics officers.  He alleges that he should have been given the detailed payment history for Sandy, which was readily available to him but that he, through his defense counsel, chose not to obtain.

The information about Sandy's payment history was never hidden from the prosecutor, Mr. Lynn or his attorney, but was readily available to both the prosecutor and the defense.  The information provided to the defense indicated the close working relationship between the paid informant and the police as well as the fact that she was working for Hamill and Whalen on drug cases and getting paid. Hamill was involved with Sandy even when she was working with the homicide detectives.   Yet, Lynn's attorney never inquired in detail into that relationship. Like the defendant in *Wilson*, in Lynn's case, the information about the payment history was available from "a source where a reasonable defendant would have looked."  Through no fault of the police officers, Lynn's counsel - who was in a position to ask Sandy and Detective Hamill at the pre-trial suppression hearing any

_____

aware of evidence in time to reasonably and effectively use it at trial).

and all details about the payments Sandy received - failed to take advantage of the evidence and failed to participate in reasonable inquiry and investigation when he given the opportunity. The police should not be held liable because the defense attorney did a poor job, particularly in light of the fact that the information was available to him and easily accessible.

Finally, although the prosecutor's duty under *Brady* and its progeny is clearly established, the case law does not place a direct duty or create a direct cause of action against the police for a *Brady* violation. Although this Court has been reluctant to recognize a direct cause of action under *Brady* against police officers, the analysis used by this Court in *Jean v. Collins (Jean II)*, 221 F.3d 656 (4th Cir. 2000), is helpful to resolving the present case. In *Jean II*,[4] this Court was faced with the question of whether there was an additional constitutional due process violation committed as the result of the individual police officers withholding hypnosis recordings and reports from the prosecutor. In the present case, the trial court had already concluded that Mr. Lynn suffered a violation of his rights because his criminal defense attorney did not adequately represent him and Lynn was granted a new trial based on ineffectiveness of counsel.

In *Jean II,* the court recognized that, "The Supreme Court decisions

---

[4] In a prior case, *Jean v. Rice*, 945 F.2d 82 (4th Cir. 1991), the Court held that Jean's due process rights had been violated by the prosecutor because the government had failed to turn over impeachment evidence to the defense. As a result, the criminal defendant's request for a writ of habeas corpus was granted.

establishing the *Brady* duty on the part of prosecutors do not address whether a police officer independently violates the Constitution by withholding from the prosecutor evidence acquired during the course of an investigation." *Jean II*, 221 F.3d at 659 (citations omitted). Although some cases have pointed toward such a duty, this Court concluded that "[t]hese cases have left unclear the exact nature of any duty that the law imposes on police with regard to exculpatory evidence." *Id.* In fact, "to speak of the duty binding police officers as a *Brady* duty is simply incorrect. The Supreme Court has always defined the *Brady* duty as one that rests with the prosecution." *Id.* at 660 (citations omitted). Since it is the prosecutor's role to ask "lawyer's questions," such as whether the evidence is "exculpatory" or "impeachment" in nature and whether such evidence is "material," "[i]t would be inappropriate to charge police with answering these same questions, for their job of gathering evidence is quite different from the prosecution's task of evaluating it." *Id.; see also Kyles v. Whitley*, 514 U.S. 419, 437 (1995) ("the prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of "reasonable probability is reached").

Even the Supreme Court has avoided imposing the same duty of disclosure held by a prosecutor on police officers. In *Arizona v. Youngblood*, 488 U.S. 51, 55 (1988), the police failed to refrigerate clothing which contained semen stains and

failed to perform tests on other semen samples. *Id.* at 53-55, 58. The defendant argued that properly preserved evidence might have shown that he was innocent of the crime of sexual assault. However, the Supreme Court held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id.* at 58. Although *Youngblood* dealt with the failure to preserve evidence, this Court noted that the same principles applied to disclosure of evidence and "decline[d] to impose a sweeping duty on police." *Jean II*, 221 F.3d at 661, citing *Youngblood*, 488 U.S. at 58. In fact, this Court noted the obvious drawbacks of imposing such a duty: "For instance, such a duty would widen the legal gulf between prosecutors and police to such an extent as to make scapegoats of police for every item of evidence discovered post-trial. Prosecutors plainly enjoy absolute immunity in the exercise of their prosecutorial duties, of which the disclosure of *Brady* material to the defense is clearly one." *Jean II*, 221 F.3d at 661 (citations omitted). "To confer on prosecutors absolute immunity while denying police the right to argue even bona fides would multiply exponentially litigation against even conscientious officers." *Id.*

    In the present case, impeachment evidence relating to Sandy as a confidential paid informant was disclosed by the police to the prosecutor and then to the criminal defendant, through his counsel, in advance of his first trial. Any

evidence of the history of any payments was readily available and accessible to both the prosecutor and the defense attorney. Therefore, there can be no *Brady* violation attributable to the police officers in this case.

To the extent there may be a *Brady* obligation on the police, this Court in *Jean II* indicated that the conduct at least must have been in bad faith, deliberate and intentional. There is no evidence of bad faith or a deliberate or intentional withholding by the police in this case. While Lynn may allege that the police officers acted in bad faith, there is nothing in the evidence to suggest such a conclusion. The prosecutor and the criminal defense attorney were provided with the necessary information. As this Court has stated, the "law has already placed the ultimate responsibility upon the prosecutor for disclosing *Brady* material to the defense," and "[b]ecause police knowledge is plainly imputed to the prosecution for purposes of the prosecutor's *Brady* duties.... the prosecutor bears the responsibility for implementing procedures designed to ensure that police officers turn over all evidence to him…." (citations omitted.) *Jean II,* 221 F.3d at 661.

**II.    The Appellant police officers are entitled to qualified immunity because the law regarding a police officer's duty under the *Brady* doctrine was not clearly established such that they knew or should have known that their conduct violated Mr. Lynn's constitutional right under the Fourteenth Amendment.**

While the first step in the two-step qualified immunity analysis is met by showing there is no constitutional violation, the Court can look directly to the

second step which focuses on a determination of whether there is a clearly established right that a police officer could reasonably know he was violating. *See Pearson v. Callahan*, 555 U.S. __, 129 S. Ct. 808, 822 (2009). Qualified immunity "protects law enforcement officers from 'bad guesses in gray areas' and ensures that they are liable only 'for transgressing bright lines.' " *Wilson v. Layne*, 141 F.3d 111, 114 (4th Cir. 1998) (quoting *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992)). This immunity is an immunity from suit as opposed to a mere defense to liability. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). *See also Torchinsky v. Siwinski*, 942 F.2d 257, 261 (4th Cir. 1991).

In determining whether an officer is entitled to qualified immunity, "[t]he central question is whether someone in the officer's position could reasonably but mistakenly conclude that his conduct complied with" the constitution. *Groh v. Ramirez,* 540 U.S. 551, 566 (2004). To benefit from this protection, a government official must be performing a discretionary function and his conduct cannot violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). *See also DiMeglio v. Haines*, 45 F.3d 790, 794 (4th Cir. 1995) ("[T]he court must, in addressing the qualified immunity defense, consider whether the plaintiff has alleged a violation of law that was clearly established at the time the challenged actions are taken"). And under the recent Supreme Court case, *Pearson v.*

23

*Callahan*, the court can begin and end with this determination.

To decide whether a plaintiff has asserted a clearly established right, a court must focus " 'not upon the right at its most general or abstract level, but at the level of its application to the specific conduct being challenged.' " *DiMeglio*, 45 F.3d at 803, quoting *Wiley v. Doory*, 14 F.3d 993 (4th Cir. 1994). *See also Gooden v. Howard County*, 954 F.2d 960, 968 (1992) (stating that "[t]he right must be sufficiently particularized to put potential defendants on notice that their conduct is probably unlawful") (internal citation omitted). While a "prior case holding identical conduct to be unlawful is not required," the unlawfulness of the conduct at issue must be "manifest under existing law." *Vathekan v. Prince George's County*, 154 F.3d 173, 179 (4th Cir. 1998).

In *Pearson v. Callahan*, *supra*, the Supreme Court reconsidered the two-step process previously required by *Saucier v. Katz*, 533 U.S. 194 (2001), and determined that the *Saucier* procedure should not be mandatory or "regarded as an inflexible requirement" but should allow a judge to decide which part to address first. *Pearson,* 129 S. Ct. at 813. The *Saucier* court mandated a two-step sequence to determine the application of qualified immunity. First, the court had to decide if the facts alleged by plaintiff could establish a constitutional right. *Saucier*, 533 U.S. at 201. Once the plaintiff passed this hurdle, the court then determined whether the right at issue was "clearly established" at the time of the

alleged violation. *Id*. Qualified immunity would apply unless the official's conduct violated a "clearly established" constitutional right.

Appellants Hamill, Whalen, Tarney, and Fallin are entitled to qualified immunity in this case because the law was not clearly established such that they knew or should have known that their actions violated a constitutional right of Plaintiff. The law in 1994 did not clearly establish the parameters of a duty upon police officers to provide exculpatory or impeachment information to prosecutors. The law stresses the duty of the prosecutor to disclose information to the defense and to learn of any information that other government actors have. During this time period, the only case that might be read to impose a duty on police officers to provide exculpatory or impeachment information to prosecutors is *Goodwin v. Metts*, 885 F.2d 157 (4th Cir. 1989). Even that case falls short.

In *Goodwin*, the investigating police officer willfully withheld from the prosecutor a confession which would tend to exculpate the defendants, while at the same time relying on the confession to close out his internal police files. The defendants were acquitted at their first trial, and then sued several individuals, including the investigating police officers, for numerous charges, including a violation of due process under 42 U.S.C. § 1983. They succeeded against the police officers at trial, and the officers appealed the denial of their motion for judgment notwithstanding the verdict. This Court found that a reasonable officer

would have known the confession was "at least potentially exculpatory." *Goodwin*, 885 F.2d at 164.   The *Goodwin* Court held that "[a]n officer cannot invoke qualified immunity where he, 'did not avail himself of readily available information that would have clarified matters to the point that [the criminal charges] would have been flatly ruled out as factually unsupportable.' " *Id.* citing *Sevigny v. Dicksey*, 846 F.2d 953, 957-58 (4th Cir. 1988).   Despite this ruling, *Goodwin* does not clearly establish a duty for the police to provide information to prosecutors other than confessions.

In fact, this Court has not placed much reliance on the *Goodwin* opinion in defining the parameters of a *Brady* duty for police.   In *Walker v. Sopher*, this Court read *Goodwin* to "recognize a § 1983 due process claim against a police officer for conduct that would constitute the tort of malicious prosecution under state law." *Walker v. Sopher*, 1998 U.S. App. LEXIS 23712, *13 (4th Cir. 1998).   This Court concluded that the "core holding [of *Goodwin*] has been called into doubt by the Supreme Court" in its decision in *Albright v. Oliver* 510 U.S. 266 (1994)) and that "the legal claim before the *Goodwin* court and upon which its holding rests is now discredited." *Id.* at *13-14.[5]   The Court went on to hold that:

---

[5] In *Albright*, the majority held that "there is no substantive due process right 'to be free from criminal prosecution expect upon probable cause' " and that "substantive due process is likewise unavailable as a theory to elevate a common law malicious prosecution claim to constitutional status." *Walker* at *13-14 (citations omitted).

"[T]o the extent" *Goodwin* may have rested on a general duty to turn over exculpatory evidence so as to ensure a fair trial, *Albright* did not affect it. The problem is that neither we nor a reasonable public official can know how "extensively" the *Goodwin* court relied on this ground, or even if it would have decided the case the same way had it foreseen *Albright*. In short, the law must simply be clearer than *Goodwin* made it before public officials can be stripped of qualified immunity.

*Walker* at *15.

While the law may provide some right at a "general or abstract level," that is insufficient to provide the required knowledge to the police here. The law must be such that it focuses on a level which addresses "the specific conduct being challenged." *DiMeglio*, 45 F.3d at 803. Other than the *Goodwin* case, there were no cases prior to November 1994 which would have required these police officers to do more than they did in this case. Even if information regarding the specific payments to the informant should have been turned over to the defense, no reasonable officer in 1994 would have believed that he was violating a defendant's constitutional rights by not providing the specific payment history in light of the information that was provided.

*Brady* was decided by the Supreme Court in 1963. The following year, the Fourth Circuit held that evidence withheld by police from the prosecutor would be imputed to the prosecutor in deciding whether the prosecutor had fulfilled his duties under *Brady*. *See Barbee v. Warden*, 331 F.2d 842, 846 (4th Cir. 1964). This approach has not changed. *See* discussion of the *Jean v. Collins* case above.

27

To see just how unclear the parameters of this duty are, one need only review the cases from various circuits which have left unanswered the exact nature of any duty that the law imposes on police with regard to exculpatory and impeachment evidence under *Brady*. *See Brady v. Dill*, 187 F.3d 104, 114 (1st Cir. 1999) (the prosecutor has a duty to reveal material exculpatory evidence, but the Constitution imposes no parallel duty on a police officer); *Walker v. City of New York*, 974 F.2d 293, 298-99 (2d Cir. 1992) (*Brady* does not discuss the relative disclosure obligations of police and prosecutor and the police satisfy their obligations under *Brady* when they turn exculpatory evidence over to the prosecutors; "[a] rule requiring the police to make separate, often difficult, and perhaps conflicting, disclosure decisions would create unnecessary confusion"); *Walker v. Sopher*, 1998 U.S. App. Lexis 23712, *12 (4th Cir. 1998) (court did not find that the contours of the *Brady* obligation were clearly established in the period of 1982 to 1994); *Jean v. Collins*, 221 F. 3d 656, 659 (4th Cir. 2000) (cases have left unclear the exact nature of any duty that the law imposes on police with regard to exculpatory evidence); *Porter v. White,* 483 F.3d 1294, 1304 (11th Cir. 2007) ("[o]ur decision in *McMillian*, therefore, left open the question of whether less-than-intentional conduct would suffice to establish a Brady-type due process claim against law enforcement officials") citing to *McMillian v. Johnson*, 88 F.3d 1554, 1566-70 (11th Cir. 1996).

Even this Court divided in the long running case of *Jean v. Collins* (*Jean II*), with six judges concurring with the lower court and six dissenting from the opinion. *Jean II,* 221 F.3d 656. With so much disagreement among judges and legal scholars over such a long period of time, it is patently unfair to expect police officers to know the exact parameters of the law. "If judges…disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy." *Haley v. City of Boston,* 2009 U.S. Dist. LEXIS 121565 (D. Mass. December 31, 2009) quoting *Wilson v. Layne*, 526 U.S. 603, 618 (1999).

From 1964, courts have held that the duty to disclose exculpatory or impeaching evidence under *Brady* lies with prosecutor, not the police. In 1994, there was no clearly established constitutional violation that the officers in this case should have known of to impose on them the responsibility which Lynn claims. The police officers could not have known that they were required to provide every detail of every payment made to Sandy to the prosecutor or that the prosecutor's decision not to provide information to defense counsel concerning the informant's request to get paid for the murder case would somehow cause them to be charged with violating Lynn's constitutional rights. The police officers are entitled to qualified immunity, because in 1994 police officer liability under *Brady* was not clearly established. In fact, even today, no clear obligation exists.

## CONCLUSION

The district court erroneously denied Appellants' motion for summary judgment, and Appellants request that this Court reverse the lower court's ruling and grant them qualified immunity. Appellee has failed to establish a *Brady* violation under the Fourteenth Amendment against the police officers. Moreover, Appellants are entitled to qualified immunity.

Respectfully submitted,

_____s/_____
Marc. P. Hansen
Acting County Attorney

_____s/_____
Patricia P. Via, Chief
Division of Litigation

_____s/_____
Edward B. Lattner, Chief
Division of Human Resources
& Appeals

_____s/_____
Silvia C. Kinch
Associate County Attorney

Dated: March 5, 2010

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Only one form needs to be completed for a party even if the party is represented by more than
one attorney. Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or
mandamus case. Corporate defendants in a criminal or post-conviction case and corporate amici
curiae are required to file disclosure statements. Counsel has a continuing duty to update this
information.

No. 09-2303    Caption: Eric Lynn v. Edward Tarney

Pursuant to FRAP 26.1 and Local Rule 26.1,

William Whelan    who is appellant    , makes the following disclosure:
(name of party/amicus)    (appellant/appellee/amicus)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☒ NO
2.    Does party/amicus have any parent corporations?    ☐ YES ☒ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent
      corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
      other publicly held entity?    ☐ YES ☒ NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct
      financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐ YES ☒ NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☒ NO
      If yes, identify any publicly held member whose stock or equity value could be affected
      substantially by the outcome of the proceeding or whose claims the trade association is
      pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐ YES ☒ NO
      If yes, identify any trustee and the members of any creditors' committee:

## CERTIFICATE OF SERVICE
**************************

I certify that on Dec. 4, 2009 the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

Christopher Allen Griffiths, Esquire        Terrell N. Roberts, III, Esquire
6801 Kenilworth Avenue                      6801 Kenilworth Avenue
Suite 202                                   Suite 202
Riverdale, MD 20737                         Riverdale, MD 20737

_____                     12-4-09
(signature)                                 (date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Only one form needs to be completed for a party even if the party is represented by more than one attorney. Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case. Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements. Counsel has a continuing duty to update this information.

No. 09-2303    Caption: Eric Lynn v. Edward Tarney

Pursuant to FRAP 26.1 and Local Rule 26.1,

Edward Tarney        who is appellant            , makes the following disclosure:
(name of party/amicus)        (appellant/appellee/amicus)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐YES ☒NO
2. Does party/amicus have any parent corporations? ☐YES ☒NO
   If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐YES ☒NO
   If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))? ☐YES ☒NO
   If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☒NO
   If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☒NO
   If yes, identify any trustee and the members of any creditors' committee:

## CERTIFICATE OF SERVICE
****************************

I certify that on Dec 4, 2009 the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Christopher Allen Griffiths, Esquire
6801 Kenilworth Avenue
Suite 202
Riverdale, MD 20737

Terrell N. Roberts, III, Esquire
6801 Kenilworth Avenue
Suite 202
Riverdale, MD 20737

_____
(signature)

12-4-09
_____
(date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Only one form needs to be completed for a party even if the party is represented by more than one attorney. Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case. Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements. Counsel has a continuing duty to update this information.

No. 09-2303    Caption: Eric Lynn v. Edward Tarney

Pursuant to FRAP 26.1 and Local Rule 26.1,

Russell Hamill          who is appellant          , makes the following disclosure:
(name of party/amicus)          (appellant/appellee/amicus)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☒NO
2.  Does party/amicus have any parent corporations?  ☐YES ☒NO
    If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☒NO
    If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐YES ☒NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☒NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☒NO
    If yes, identify any trustee and the members of any creditors' committee:

## CERTIFICATE OF SERVICE
**************************

I certify that on Dec. 4, 2009 the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Christopher Allen Griffiths, Esquire
6801 Kenilworth Avenue
Suite 202
Riverdale, MD 20737

Terrell N. Roberts, III, Esquire
6801 Kenilworth Avenue
Suite 202
Riverdale, MD 20737

_____
(signature)

12-4-09
_____
(date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Only one form needs to be completed for a party even if the party is represented by more than one attorney. Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case. Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements. Counsel has a continuing duty to update this information.

No. 09-2303    Caption: Eric Lynn v. Edward Tarney

Pursuant to FRAP 26.1 and Local Rule 26.1,

Richard Fallin _____ who is appellant _____, makes the following disclosure:
(name of party/amicus)        (appellant/appellee/amicus)

1. Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☒ NO
2. Does party/amicus have any parent corporations?                               ☐ YES ☒ NO
   If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                                        ☐ YES ☒ NO
   If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?   ☐ YES ☒ NO
   If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question)  ☐ YES ☒ NO
   If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding?                        ☐ YES ☒ NO
   If yes, identify any trustee and the members of any creditors' committee:

## CERTIFICATE OF SERVICE
**************************

I certify that on Dec. 4, 2009 the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Christopher Allen Griffiths, Esquire
6801 Kenilworth Avenue
Suite 202
Riverdale, MD 20737

Terrell N. Roberts, III, Esquire
6801 Kenilworth Avenue
Suite 202
Riverdale, MD 20737

_Patricia R. Via_ _____
(signature)

12-4-09 _____
(date)

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of March 2010, I electronically

filed the foregoing Brief with the Clerk of the Court using the CM/ECF

System, and pursuant to Local Rule 31(d), mailed two copies of the

foregoing Brief, postage prepaid, first-class, to:

Terrell N. Roberts, III, Esquire
Christopher Griffiths, Esquire
Roberts & Woods
6801 Kenilworth Avenue, # 202
Riverdale, Maryland 20737
Attorney for Appellee

Patricia P. Via, Chief
Division of Litigation

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

No. 09-2303          **Caption:** Eric Lynn v. Edward Tarney, et al.

### CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

*[Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines; Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines; any Reply or Amicus Brief may not exceed 7,000 words or 650 lines; line count may be used only with monospaced type]*

    [✓] this brief contains 7,549 _____ *[state the number of]* words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

    [ ] this brief uses a monospaced typeface and contains _____ *[state the number of]* lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

*[14-point font must be used with proportional typeface, such as Times New Roman or CG Times; 12-point font must be used with monospaced typeface, such as Courier or Courier New]*

    [✓] this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2002 ____ *[state name and version of word processing program]* in 14 point _____ Times New Roman ____ *[state font size and name of the type style]; or*

    [ ] this brief has been prepared in a monospaced typeface using _____ _____ *[state name and version of word processing program]* with _____ _____ *[state number of characters per inch and name of type style].*

(s)  *Patricia R. Vh*_____

Attorney for Appellants _____

Dated: March 5, 2010



LEXSEE 1998 US APP LEXIS 23712


Analysis
As of: Mar 08, 2010

**JACK EARL WALKER; ELEANOR WALKER, Plaintiffs-Appellees, v.
IRVIN SOPHER, M.D. D.D.S., personally, Defendant-Appellant, and THE
TYLER COUNTY COMMISSION; GARY KELLER, personally and in his
capacity as Sheriff of Tyler County; EARL ROBERT KENDALL, personally
and in his capacity as a Deputy Sheriff of Tyler County; WALTER SMIT-
TLE, personally; ROBERT HALL, personally; MACK DENNIS, personally;
GEORGE TRENT, personally; RON GREGORY, personally; CARL
LEGURSKEY, personally; NICHOLAS J. HUN, personally; DAVE VAN-
CAMP, personally, Defendants. JACK EARL WALKER; ELEANOR
WALKER, Plaintiffs-Appellees, v. ROBERT HALL, personally; MACK
DENNIS, personally, Defendants-Appellants, and THE TYLER COUNTY
COMMISSION; GARY KELLER, personally and in his capacity as Sheriff
of Tyler County; EARL ROBERT KENDALL, personally and in his capac-
ity as a Deputy Sheriff of Tyler County; WALTER SMITTLE, personally;
IRVIN SOPHER, M.D. D.D.S., personally; GEORGE TRENT, personally;
RON GREGORY, personally; CARL LEGURSKEY, personally, NICHO-
LAS J. HUN, personally; DAVE VANCAMP, personally, Defendants.**

**No. 95-2248, No. 96-1088**

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

*1998 U.S. App. LEXIS 23712*

**July 10, 1996, Argued
September 23, 1998, Decided**

**NOTICE:     [\*1]**  RULES OF THE FOURTH
CIRCUIT COURT OF APPEALS MAY LIMIT
CITATION TO UNPUBLISHED OPINIONS.
PLEASE REFER TO THE RULES OF THE
UNITED STATES COURT OF APPEALS FOR
THIS CIRCUIT.

**SUBSEQUENT HISTORY:**     Reported in Table
Case Format at: *1998 U.S. App. LEXIS 356*

**PRIOR HISTORY:**     Appeals from the United
States District Court for the Northern District of
West Virginia, at Clarksburg. Irene M. Keeley, Dis-
trict Judge. (CA-94-143-1).

**DISPOSITION:**     REVERSED IN PART, DIS-
MISSED IN PART, AND REMANDED.

**CASE SUMMARY:**

1998 U.S. App. LEXIS 23712, *

**PROCEDURAL POSTURE:** Appellants, medical examiner and assistant fire marshals, challenged the order of the United States District Court for the Northern District of West Virginia, which denied their motions to dismiss, pursuant to *Fed. R. Civ. P. 12(b)(6)*, the action brought by appellees, suspect and wife, pursuant to *42 U.S.C.S. § 1983* and state law based on the withholding of exculpatory evidence in the suspect's prosecution for arson and murder.

**OVERVIEW:** The suspect and his wife brought an action pursuant to *42 U.S.C.S. § 1983* and state law against, among others, the medical examiner and the assistant fire marshals. The suspect was tried three times and was finally acquitted of arson and murder. The medical examiner and the assistant fire marshals kept separate files and intentionally did not provide exculpatory information to the prosecutor. The medical examiner and the assistant fire marshals filed motions to dismiss the action pursuant to *Fed. R. Civ. P. 12(b)(6)* based on both absolute and qualified immunity. The district court denied the motion, and the medical examiner and the assistant fire marshals filed consolidated interlocutory appeals. The court reversed the district court's order on the immunity issue and held that the conduct did not violate clearly established statutory or constitutional rights of which a reasonable person should have known and that the qualified immunity applied. The court remanded the case to the district court for further proceedings because the failure to dismiss the state law claims was not a final order and was not independently appealable.

**OUTCOME:** The court reversed the order of the district court and held that the medical examiner and assistant fire marshals were entitled to qualified immunity from the federal civil rights action. However, because the court had no jurisdiction to review the district court's decisions regarding the pendent state law claims, the court dismissed the appeals in part.

**CORE TERMS:** prosecutor, exculpatory evidence, qualified immunity, immunity, law claims, malicious prosecution, investigator, absolute immunity, withheld, state law, public officials, failure to disclose, en banc, challenged actions, intentionally, prosecutorial, materially, disclose, break-in, autopsy, arson, state common law, constitutional rights, constitutional duty, interlocutory appeals, reasonable person, government officials, fair trial, process rights, investigating officer

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims*
*Civil Procedure > Dismissals > Involuntary Dismissals > Failures to State Claims*
*Civil Procedure > Appeals > Standards of Review > De Novo Review*
[HN1] An appellate court reviews de novo the disposition of a motion to dismiss for failure to state a claim upon which relief can be granted under *Fed. R. Civ. P. 12(b)(6)*. A *Rule 12(b)(6)* motion should be granted only in very limited circumstances. Indeed, a motion to dismiss should not be granted unless it appears to a certainty that the plaintiff would be entitled to no relief under any state of facts that could be proved in support of his claim. Thus, in considering a motion to dismiss, the appellate court accepts the factual allegations in the complaint as true and affords the plaintiff the benefit of all reasonable inferences that can be drawn from those allegations.

*Civil Rights Law > Immunity From Liability > Local Officials > Customs & Policies*
*Torts > Public Entity Liability > Immunity > General Overview*
[HN2] Qualified immunity shields government officials performing discretionary functions from personal liability for damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. The qualified immunity defense is designed to allow government officials the freedom to exercise fair judgment without being blindsided by liability derived from newly invented rights or new, unforeseen applications of pre-existing rights. Qualified immunity protects all but the plainly incompetent or those who knowingly violate the law. Officials are not liable for bad

guesses in gray areas; they are liable for transgressing bright lines.

*Civil Rights Law > Immunity From Liability > Local Officials > Customs & Policies*
*Torts > Public Entity Liability > Immunity > General Overview*

[HN3] In addressing a qualified immunity defense, a court first asks whether the plaintiff has alleged a violation of law that was clearly established at the time the challenged actions were taken. If the plaintiff has alleged a violation of clearly established law, a court then considers whether a reasonable person in the official's position would have known that his actions violated that right.

*Civil Procedure > Jurisdiction > Jurisdictional Sources > General Overview*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Motions to Dismiss*
*Civil Procedure > Appeals > Dismissals of Appeals > General Overview*

[HN4] The appellate court's jurisdiction over an interlocutory appeal from a denial of immunity does not permit it to consider another ruling of the district court, absent an independent jurisdictional basis, unless the other issue is (1) inextricably intertwined with the decision to deny immunity or (2) consideration of the additional issue is necessary to ensure meaningful review of the immunity question.

**COUNSEL:** ARGUED: Marvin Richard Dunlap, DICKIE, MCCAMEY & CHILCOTE, P.C., Pittsburgh, Pennsylvania; David L. Wyant, SHUMAN, ANNAND & POE, Wheeling, West Virginia, for Appellants.

Stephen Douglas Herndon, Wheeling, West Virginia, for Appellees.

**JUDGES:** Before NIEMEYER, MICHAEL, and MOTZ, Circuit Judges.

**OPINION**

**OPINION**

PER CURIAM:

Jack Earl Walker and his wife Eleanor brought this action pursuant to *42 U.S.C. § 1983* and state law against, among others, the appellants, Dr. Irvin Sopher, who was Chief Medical Examiner for the State of West Virginia, and Robert Hall and Mack Dennis, Assistant State Fire Marshals. The Walkers alleged that Sopher, Hall, and Dennis violated Jack **[*2]** Walker's constitutional rights by intentionally withholding from the prosecutor materially exculpatory evidence that they possessed as a result of their investigation of Jack Walker for murder and arson. Appellants moved to dismiss this action pursuant to *Fed. R. Civ. P. 12(b)(6)*, asserting both absolute and qualified immunity. The district court denied the motion, and appellants have filed these consolidated interlocutory appeals. Based on a recent, largely dispositive precedent of this court, we reverse the judgment of the district court and hold that the appellants are entitled to qualified immunity from the federal causes of action. However, because we have no jurisdiction to review the district court's decisions regarding the Walkers' pendent state law claims, we dismiss the appeals in part.

I.

On May 11, 1989, Jack Walker was arrested in Tyler County, West Virginia, for the murder of Mary Sherwood and the arson of her home. Walker was incarcerated until his trial in state circuit court. On March 23, 1990, he was found guilty and began serving a life sentence.

The Supreme Court of Appeals of West Virginia reversed Walker's conviction for reasons unrelated to the present action **[*3]** and remanded the case for a new trial. *State v. Walker, 188 W. Va. 661, 425 S.E.2d 616 (1992)*. On May 17, 1993, his second trial resulted in a hung jury, and Walker was released from custody. The state tried Walker a third time in April 1994, and he was finally acquitted.

On December 4, 1994, the Walkers filed this suit pursuant to *42 U.S.C. § 1983* and state law. The Walkers alleged that Dr. Sopher, Hall, and Dennis violated Jack Walker's rights under the *Fourth*, *Fifth*, *Sixth*, and *Fourteenth Amendments to the United States Constitution*. In particular, the Walkers alleged that each of the appellants intentionally

and maliciously withheld materially exculpatory evidence from the prosecutor.

As Chief Medical Examiner for West Virginia, Dr. Sopher conducted the postmortem examination of Mary Sherwood's body on May 11, 1989. The Walkers contend that Dr. Sopher was ordered to file all materials relating to the autopsy of the victim in a sealed document, but the only material filed was his formal report and a photograph of the victim's skull. Moreover, they allege that Dr. Sopher failed to provide tissue samples, autopsy records, photographs, [*4] teaching slides, x-rays, diagrams, test results, graphs, notes, histologic slides, chain of custody documents, and other materials, as ordered by the state court in advance of the second trial. Tissue samples whose existence was disclosed at the second trial were not provided prior to the third trial. Finally, the Walkers allege that Dr. Sopher told Sheriff Gary Keller by telephone that the gunshot wound appeared to be consistent with a .38 caliber weapon and that this oral report was not disclosed to the defense prior to the first or second trials.

As for Hall and Dennis, the Walkers allege that they also intentionally withheld exculpatory evidence, which they collected and maintained in a separate file from the one furnished to the prosecutor. Specifically, they contend that Hall collected four cans of debris from the fire scene, some of which indicated that the fire was not the product of arson, and that Hall found a broken kerosene lantern and substandard natural gas line pipe joints at the scene, both of which could have provided plausible alternative explanations as to the fire's origin. The Walkers contend that Hall delivered this exculpatory evidence to Dennis, who then transferred [*5] it to the forensic section of the West Virginia Department of Public Safety for analysis. Dennis, with Hall's knowledge, kept this information in a file separate from the one made available to the prosecuting attorney.

Sopher, Hall, and Dennis each moved to dismiss the actions against them pursuant to *Fed. R. Civ. P. 12(b)(6)*, relying on both absolute and qualified immunity. The district court declined to dismiss the Walkers' *§ 1983* claim that the appellants withheld exculpatory evidence. The court also declined to dismiss the state common law claims of malicious prosecution. Sopher, Hall, and Dennis appeal these rulings.

II.

[HN1] We review *de novo* the disposition of a motion to dismiss for failure to state a claim upon which relief can be granted under *Rule 12(b)(6)*. *See Mylan Laboratories, Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993), cert. denied, 510 U.S. 1197, 127 L. Ed. 2d 658, 114 S. Ct. 1307 (1994).* [1] "[A] *rule 12(b)(6)* motion should be granted only in very limited circumstances." *Rogers v. Jefferson-Pilot Life Ins. Co., 883 F.2d 324, 325 (4th Cir. 1989).* Indeed, a motion to dismiss "'should not be granted unless [*6] it appears to a certainty that the plaintiff would be entitled to no relief under any state of facts which could be proved in support of his claim.'" *Id.* (quoting *Johnson v. Mueller, 415 F.2d 354, 355 (4th Cir. 1969)).* Thus, in considering a motion to dismiss, we accept the factual allegations in the complaint as true and afford the plaintiff the benefit of all reasonable inferences that can be drawn from those allegations. *Mylan Laboratories, 7 F.3d at 1134*; *Rogers, 883 F.2d at 325.*

> 1   Appellants' motion to strike the Walkers' brief is denied. However, we have not considered any material other than the allegations in the Walkers' complaint.

III.

Appellants assert that they are entitled to qualified immunity even if the Walkers' allegations are true. [HN2] Qualified immunity shields government officials performing discretionary functions from personal liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional [*7] rights of which [a] reasonable person would have known." *Harlow v. Fitzgerald, 457 U.S. 800, 818, 73 L. Ed. 2d 396, 102 S. Ct. 2727 (1982)*; *DiMeglio v. Haines, 45 F.3d 790, 794 (4th Cir. 1995).* The qualified immunity defense is designed "to allow government officials 'the freedom to exercise fair judgment' without 'being blindsided by liability derived from newly invented rights or new, unforeseen applications of pre-existing rights.'" *Cromer v. Brown, 88 F.3d 1315, 1324 (4th Cir. 1996)* (quoting *Pinder v. Johnson, 54 F.3d 1169, 1173* (4th Cir.) (en banc), *cert. denied* ,

*516 U.S. 994, 133 L. Ed. 2d 436, 116 S. Ct. 530 (1995)).*

Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs, 475 U.S. 335, 341, 89 L. Ed. 2d 271, 106 S. Ct. 1092 (1986).* "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992), cert. denied, 506 U.S. 1080, 122 L. Ed. 2d 356, 113 S. Ct. 1048 (1993).* This **[*8]** immunity is not afforded out of some special solicitude for the interests of public officials over those of ordinary citizens. Its purpose is to allow officials to govern with vigor rather than with timidity, *Anderson v. Creighton, 483 U.S. 635, 638, 97 L. Ed. 2d 523, 107 S. Ct. 3034 (1987)*, and vigorous pursuit of the goals of a democratic government is very much in the interest of the people.

[HN3] In addressing a qualified immunity defense, we first ask "whether the plaintiff has alleged a violation of law that was clearly established at the time the challenged actions were taken." *DiMeglio, 45 F.3d at 794.* If the plaintiff has alleged a violation of clearly established law, we then consider "whether a reasonable person in the official's position would have known that his actions violated that right." *Id.* n.1.

Recently, our court sat en banc to decide a case asking whether, as of 1982, it was clearly established that an investigator violates an accused's due process rights by failing to disclose exculpatory evidence to the prosecutor. We concluded that it was not. *Jean v. Collins, 155 F.3d 701, 1998 U.S. App. LEXIS 22659* **[*9]** (4th Cir. Sept. 17, 1998) (en banc).² 

2   The other key holding of *Jean* is that investigators are "absolutely immune from suits challenging a failure to disclose evidence directly to the defense." 155 F.3d at   . We reasoned that the decision to disclose or not to disclose evidence to the defense was a prosecutorial function; hence, under the functional approach to absolute immunity prescribed by the Supreme Court, investigators share the absolute immunity already afforded prosecutors for such decisions. *Id.* at   . *See Buckley v. Fitzsimmons, 509 U.S. 259, 268-269, 125 L. Ed. 2d 209, 113 S. Ct. 2606 (1993)* (discussing functional approach); *Imbler v. Pachtman, 424 U.S. 409, 430, 47 L. Ed. 2d 128, 96 S. Ct. 984 (1976)* (affording absolute immunity to prosecutors performing prosecutorial functions); *Carter v. Burch, 34 F.3d 257, 262-263 (4th Cir. 1994)* (absolute prosecutorial immunity extends to alleged withholding of exculpatory evidence), *cert. denied, 513 U.S. 1150, 130 L. Ed. 2d 1068, 115 S. Ct. 1101 (1995).*

**[*10]** In *Jean* we first defined the universe of law of which we expect public officials to be aware. We concluded that "ordinarily . . . courts in this circuit need not look beyond the decisions of the Supreme Court, this court of appeals, and [where appropriate] the highest court of the state in which the case arose[.]" *Id.* at   . We then examined this case law as it stood in 1982 and determined that, at most, it established that prosecutors have a constitutional duty to provide exculpatory evidence to an accused (for the exercise of which *Imbler* affords absolute immunity) and that knowledge of information in the hands of investigators is imputed to the prosecutor for this purpose. *Id.* at   . This imputation did not impose a constitutional duty on investigators to turn over evidence to the prosecutor; instead, it "simply encouraged prosecutors' offices to establish 'procedures and regulations . . . to insure communication of all relevant information on each case.'" *Id.* at   (quoting *Giglio v. United States, 405 U.S. 150, 154, 31 L. Ed. 2d 104, 92 S. Ct. 763 (1972)).*

In light of *Jean* our analysis is largely done, inasmuch **[*11]** as it establishes the state of the law in this circuit as of 1982. Our inquiry narrows, then, to the period between 1982 and the dates of the acts complained of (that is, May 1989 through April 1994).

Only one relevant case could be argued to have changed the legal landscape during this period: *Goodwin v. Metts , 885 F.2d 157 (4th Cir. 1989), cert. denied, 494 U.S. 1081, 108 L. Ed. 2d 942, 110 S. Ct. 1812 (1990).* In *Goodwin* the plaintiffs were accused of a break-in. After their arrest the investigating officer discovered that a key informant had provided him with a false name and address and could no longer be found. More importantly, about one month before the plaintiffs' trial, another man was arrested in a neighboring jurisdiction and confessed to the break-in. Even without knowing of

this confession, the public prosecutor declined to try the very weak case. Instead, a private lawyer who had represented the victims of the break-in did so. Prior to trial, this lawyer conferred with the investigating officer, who did not mention that another man had confessed to the crime. After a jury trial, the plaintiffs were acquitted. They later brought **[*12]** a successful *§ 1983* action against the officer.

On the officer's appeal, we stated that "[a] police officer who withholds exculpatory information from the prosecutor can be liable under both *§ 1983* and the state common law." *885 F.2d at 162.* "Being subjected to a prosecution because an officer withheld exculpatory evidence from the prosecutor while urging that the prosecution should go forward can work a constitutional deprivation." *Id. at 163.*

The question for us, then, is whether these pronouncements rendered "the 'contours of the right' . . . so conclusively drawn as to leave no doubt that the challenged action[s were] unconstitutional." *Swanson v. Powers, 937 F.2d 965, 969 (4th Cir. 1991)* (quoting *Anderson, 483 U.S. at 640*), *cert. denied, 502 U.S. 1031, 116 L. Ed. 2d 777, 112 S. Ct. 871 (1992).* We think that they did not.

First of all, *Goodwin* was decided on September 12, 1989. Many of the "challenged actions" in this case -- the gathering of physical evidence and the autopsy -- occurred before then. Second, the precise legal basis for the holding in *Goodwin* is not entirely clear. **[*13]** We described the *section 1983* claim at issue in *Goodwin* alternately as "wrongful prosecution" or "malicious prosecution resulting in a constitutional deprivation." *Goodwin, 885 F.2d at 160* & n.1. Moreover, though our analysis seemed to rest on due process, we did not precisely articulate that reliance.

Third, its core holding has been called into doubt by the Supreme Court. The most natural reading of *Goodwin* is that it recognized a *§ 1983* due process claim against a police officer for conduct that would constitute the tort of malicious prosecution under state law. Our discussion rested heavily on South Carolina tort law, *885 F.2d at 161-162*, and, in a subsequent appeal concerning attorney's fees for the very same case, we described the verdicts as resting "only upon [the] malicious prosecution claims[.]" *Goodwin v. Metts, 973 F.2d 378, 383 (4th Cir. 1992).* In 1994 a majority of the Supreme

Court held that there is no substantive due process right "to be free from criminal prosecution except upon probable cause," *Albright v. Oliver, 510 U.S. 266, 268, 127 L. Ed. 2d 114, 114 S. Ct. 807* (plurality) & 286-291 ( **[*14]** Souter, J., concurring) (1994), and a different majority recognized that substantive due process is likewise unavailable as a theory to elevate a common law malicious prosecution claim to constitutional status. *Id. at 270 n.4* (plurality opinion) & 281-286 (Kennedy, J., joined by Thomas, J., concurring) (1994). Thus, the legal claim before the *Goodwin* court and upon which its holding rests is now discredited.

In *Taylor v. Waters, 81 F.3d 429 (4th Cir. 1996),* we observed that to the extent that *Goodwin* bases its holding on a conclusion that the officer's failure to disclose exculpatory evidence deprived the *§ 1983* plaintiffs of a liberty interest in avoiding prosecution on less than probable cause, that reasoning has been rejected in *Albright v. Oliver, 114 S. Ct. [807 (1994)]* .... But to the extent that *Goodwin* ruled that the officer's failure to disclose exculpatory information deprived the *§ 1983* plaintiffs of their right to a fair trial, its holding is not affected by *Albright. See generally Brady v. Maryland, 373 U.S. 83, 87, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963)* .... *Taylor, 81 F.3d at 436 n.5.* **[*15]** These observations are true enough: "to the extent" *Goodwin* may have rested on a general duty to turn over exculpatory evidence so as to ensure a fair trial, *Albright* did not affect it. The problem is that neither we nor a reasonable public official can know how "extensively" the *Goodwin* court relied on this ground, or even if it would have decided the case the same way had it foreseen *Albright.* In short, the law must simply be clearer than *Goodwin* made it before public officials can be stripped of qualified immunity. [3]

> 3   Our decision that the appellants are entitled to qualified immunity on the federal claims obviates any need for us to address their contention that they are absolutely immune from liability on those same claims.

IV.

Finally, appellants also ask us to review the district court's decision not to dismiss the Walkers' state law claims. We lack jurisdiction to do so. The

1998 U.S. App. LEXIS 23712, *

district court's denial of the motion to dismiss the Walkers' state law claims is not a final order and **[*16]** is therefore not independently appealable. [HN4] Our jurisdiction over an interlocutory appeal from a denial of immunity does not permit us to consider another ruling of the district court, absent an independent jurisdictional basis, "unless the other issue is (1) inextricably intertwined with the decision to deny [] immunity or (2) consideration of the additional issue is necessary to ensure meaningful review of the [] immunity question." *Taylor, 81 F.3d at 437* (citing *Swint v. Chambers County Comm'n, 514 U.S. 35, 51, 131 L. Ed. 2d 60, 115 S. Ct. 1203 (1995)).*

The state law issues in this case are whether the Walkers stated a cognizable claim for malicious prosecution and whether Hall and Mack are entitled to state common law immunity. These issues are neither "inextricably intertwined with" nor "necessary" to our review of the federal immunity questions. *See id.* Therefore, we cannot now review the district court's rulings on the Walkers' state law claims.

In sum, the order of the district court denying appellants' motion to dismiss the *§ 1983* claims based on qualified immunity is reversed. The remainder of the appeal is dismissed, and the **[*17]** case is remanded for such further proceedings as may be necessary.

*REVERSED IN PART, DISMISSED IN PART, AND REMANDED*