RECORD NO. 09-2303

In The

# United States Court Of Appeals

For The Fourth Circuit

## ERIC D. LYNN,

*Plaintiff – Appellee,*

v.

## EDWARD TARNEY; RICHARD FALLIN; RUSSELL HAMILL; WILLIAM WHELAN,

*Defendants – Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
AT GREENBELT

_____

**BRIEF OF APPELLEE**
_____

Terrell N. Roberts, III
Christopher A. Griffiths
ROBERTS & WOOD
6801 Kenilworth Avenue
Suite 202
Riverdale, MD 20737
(301) 699-0764

*Counsel for Appellee*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Only one form needs to be completed for a party even if the party is represented by more than one attorney. Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case. Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements. Counsel has a continuing duty to update this information.

No. _____      Caption: _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_____ who is _____, makes the following disclosure:
  (name of party/amicus)          (appellant/appellee/amicus)

1.      Is party/amicus a publicly held corporation or other publicly held entity?    YES    NO

2.      Does party/amicus have any parent corporations?    YES    NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    YES    NO
      If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    YES    NO
      If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)    YES    NO
      If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?    YES    NO
      If yes, identify any trustee and the members of any creditors' committee:

# CERTIFICATE OF SERVICE
**************************

I certify that on _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

_____          _____
(signature)                                                              (date)

2

# TABLE OF CONTENTS

**Page:**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

I.   STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.   SANDY'S CREDIBILITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B.   SANDY WAS PAID FOR HER COOPERATION IN THE
        HOMICIDE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        1.   THE PAYMENT "SYSTEM" . . . . . . . . . . . . . . . . . . . . . . . . 11

        2.   THE PAYMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    C.   THE OFFICERS WILLFULLY CONCEALED THE
        PAYMENTS FROM THE PROSECUTION . . . . . . . . . . . . . . . . . 26

II.  SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

III.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

    STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

    A.   THE EVIDENCE PRESENTED SHOWS THAT THE
        OFFICERS DELIBERATELY WITHHELD EXCULPATORY
        INFORMATION FROM THE PROSECUTOR IN
        VIOLATION OF LYNN'S RIGHT UNDER THE DUE
        PROCESS CLAUSE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

        1.   Under § 1983, the Officers Can Be Held Liable for
            Withholding Exculpatory Evidence From the Prosecutor,
            Notwithstanding the Primacy of the Prosecutor's Duty
            under Brady to Disclose the Evidence Directly to the
            Accused. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

2.  The Officers Were Keenly Aware of the Exculpatory Nature and Significance of the Payments to Sandy and Withheld the Evidence from the Prosecutor Intentionally. . . 37

3.  Disclosure that Sandy was a Paid Informant in Narcotics Cases, But Without Disclosing That the Officers Had Paid Sandy Numerous Times for her Information and Cooperation in the Murder Case, Caused Lynn to be Subjected to a Violation of the Due Process Clause's Guarantee of a Fair Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

4.  The Exculpatory Evidence Which the Officers Withheld Was Not Available to Lynn and It Did Not Lie in a Source Where it was Reasonable for Him to Look . . . . . . . . 46

B.  THE OFFICERS ARE NOT ENTITLED TO QUALIFIED IMMUNITY BECAUSE THE DUTY ON THE PART OF THE POLICE TO TURN OVER EXCULPATORY EVIDENCE TO THE PROSECUTOR WAS CLEARLY ESTABLISHED. . . . . . . . 48

IV.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

ii

# TABLE OF AUTHORITIES

**Page(s):**

**Cases:**

Albright v. Oliver,
    510 U.S. 266 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49, 51

Arkansas Writer's Project, Inc. v. Ragland,
    481 U.S. 221 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Barbee v. Warden,
    331 F.2d 842 (4th Cir. 1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Behrens v. Pelletier,
    516 US. 299 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Brady v. Maryland,
    373 U.S. 83 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Carter v. Burch,
    34 F.3d 257 (4th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51, 52

Clarke v. Montgomery Ward & Co.,
    298 F.2d 346 (4th Cir. 1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Giglio v. United States,
    405 U.S. 150 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 40

Goodwin v. Metts,
    885 F.2d 157 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Hamrick v. United States,
    43 F.3d 877 (4th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

iii

Jean v. Collins,
    155 F.3d 701 (4th Cir. 1998)(en banc),
    vacated and remanded, 526 U.S. 1142 (1999) . . . . . . . . . . . . . . . . . . . 48, 51

Jean v. Collins,
    221 F.3d 656 (4th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 38, 39, 42

Jean v. Rice,
    945 F.2d 82 (4th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Jones v. City of Chicago,
    856 F.2d 985 (7th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Malley v. Briggs,
    475 U.S. 335, 106 S. Ct 1092, 89 L. Ed 271 (1986) . . . . . . . . . . . . . . . . . 36

Monroe v. Pape,
    365 U.S. 167 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Neil v. Biggers,
    409 U.S. 188 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Saucier v. Katz,
    533 U.S. 194 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Taylor v. Waters,
    81 F.3d 429 (4th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . 48, 49, 50, 51

United States v. Wilson,
    901 F.2d 378 (4th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Walker v. Sopher,
    1998 U.S. App. LEXIS 23712 (4th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . 50

Wilson v. Kittoe,
    337 F.3d 392 (4th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

**Constitutional Provision:**

U.S. Const. Amend. XIV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

**Statute:**

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>passim</u>

**Rules:**

Local Rule 32.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Md. Rule 4-263(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

## I.    STATEMENT OF FACTS

The district court ruled that the evidence shows that the officers intentionally withheld exculpatory evidence from the prosecutor in Eric Lynn's trial on murder charges.  The officers' statement of facts disregards facts and inferences which support that finding.  It is therefore necessary for Lynn to provide a statement of facts.

This statement of facts will focus on the following salient points.  Sandy was the State's sole eye witness, and the case depended on her credibility, which was in serious question.  <u>See</u>, Section A, <u>infra</u>.  The officers made cash payments to Sandy in order to solicit both her cooperation, and favorable testimony in Lynn's murder trial.  <u>See</u>, Section B, <u>infra</u>.  The officers concealed the true purpose of the payments made to Sandy by preparing documentation which falsely stated that the payments were for her work as a narcotics informant.  <u>See</u>, Section C, <u>infra</u>.  When the prosecutor made inquiries about Sandy's status as a paid informant, the officers misled him by advising that she was paid only for her work as a narcotics informant.  <u>See</u>, Section C, <u>infra</u>.  Despite prosecutors' admonishments that Sandy could not be paid for her cooperation on the homicide case, the detectives continued to pay her for that purpose until a conviction was secured.  <u>See</u>, Section C, <u>infra</u>.  The detectives concealed their misconduct by

1

testifying falsely at both of the defendant's criminal trials, as well as at post conviction proceedings, that the witness was not paid for her cooperation on the homicide case. See, Section C, infra. In fact, the officers continue to assert that they did not pay the witness for her cooperation on the homicide case, despite overwhelming evidence to the contrary. See, Section C, infra.

The following facts are drawn from each of the proceedings in Lynn's criminal prosecution. Lynn was accused of a murder which occurred in the early morning hours of May 25, 1994. He was arrested on June 11, 1994. On November 28, 1994, Lynn stood trial in the Circuit Court for Montgomery County, Maryland. He was found guilty of first degree murder, conspiracy to commit armed robbery, and use of a firearm in a crime of violence. He received a life plus five year sentence.

Lynn filed a petition for post conviction relief in the Circuit Court for Montgomery County, Maryland on April 23, 1997. That petition was granted on April 29, 2000. The State appealed that decision, and the Court of Special Appeals of Maryland remanded the case for further proceedings. It was during this remand that the defendant became aware of the evidence that the police had been paying Sandy for her cooperation on his case.

On June 19, 2003, the Circuit Court again granted the post conviction relief. Again, the State appealed. On August 18, 2005, the Court of Special Appeals affirmed the decision granting relief. The Court of Special appeals denied a petition for writ of certiorori, and the case was remanded for new trial.

Following post conviction proceedings, the State served notice it intended to retry Lynn. On March 6, 2006, the circuit court granted Lynn's bond review motion and released him. To that point, he had served 12 years and 4 months of his life sentence.

Lynn's second trial commenced on October 24, 2007. At this proceeding, evidence of the payments showing that she was paid for her cooperation on the homicide case was introduced to the jury. The jury acquitted Lynn of all charges.

## A.     SANDY'S CREDIBILITY

It is undisputed that Sandy was the sole witness to the murder of Ephraim Hobson. Her credibility was therefore the single most important issue at Eric Lynn's criminal trial. From the inception of the case, Sandy's credibility was in serious doubt.

Contrary to the officer's portrayal, Sandy was not a cooperative witness who "contacted Detective Hamill" to advise "that she had witnessed the Hobson shooting." Appellant's brief, at 4. In fact, it is a reasonable inference that Sandy

3

was an accomplice to the robbery/murder. Moreover, Mr. Lynn demonstrated at his criminal trial that the police contacted Sandy, not the other way around. JA 378-379, 394-397.

Sandy was a self described "crack head" who purchased and used crack cocaine on a daily basis. JA 726-727. She did not have a job, so she had to do other things to get money for crack. She admitted that she stole from people. JA 732-733. She sold drugs in small amounts, usually $50 worth, and "put some aside where (she) could smoke." JA. 720, 728. And, she acted as a confidential informant for the police on narcotics cases. JA 736. This involved "setting up" people she knew by making controlled buys for the police. JA 721-723. In return, the police would give her a cash payment in an amount which was dependant on the quantity of drugs they seized, and the number of people they arrested. JA. 723. These cash payments were very important to Sandy because she needed the money to support her drug habit. JA 737, 739.

Sandy testified that she was approached on the night of the murder by a person she knew as "Eric," and a person she described as a "fat guy." They asked her to help them purchase an "eight ball" of cocaine, and she made arrangements for them to meet with the victim, Ephraim Hobson. JA 368, 392 , 744. Sandy expected that she would be given cocaine or money for her assistance. JA 134,

4

392-393. Sandy knew that she was forbidden to engage in this type of transaction by her police handlers. JA. 219-230, 235, 228, 741.

Sandy took "Eric" and the "fat guy" to the apartment of Ephraim Hobson, a.k.a. "Tilley." JA 368. Hobson, was a known drug dealer, and Sandy was one of his regular customers. JA 225, 391, 465, 730-731, 839, 847. Sandy had been to Hobson's apartment many times. JA 225, 373. Hobson allowed Sandy and the two assailants into his apartment late at night because he trusted her. JA 226. The two individuals would not have gained access to Hobson's apartment without Sandy's assistance. JA 226, 375. Shortly after gaining entry, the two suspects shot Hobson during an attempt to rob him of his money and drugs. JA 227, 378.

Following the robbery-murder, Sandy fled the apartment and made her way home. JA 378-379, 394-396. She admitted that she avoided responding police officers as she fled the scene. JA 394-396. She testified that she did not stop to talk to the police because she "didn't want to become no defendant or anything." JA 397.

Homicide investigators responding to the Hobson shooting suspected it was drug related. JA 327, 329. As a result, a police investigator conducted a search of the department's data base system called "Drug Trak." JA. 833-836. The investigator found that Hobson had been under investigation by the Montgomery

County Police drug enforcement unit. JA. 839, 847. The data base indicated that
Detective Russ Hamill was the investigating narcotics officer. JA. 840-841, 847.

After obtaining this information, the investigator contacted Detective
Hamill. JA 840-841, 848. Hamill told the investigator that he had a confidential
informant who had previous contacts with Hobson. JA. 840-841, 848. This
informant was Sandy. JA 242. Sandy had attempted two controlled buys from
Hobson on January 24, 1994. JA 424-425, 848. Her attempts had been
unsuccessful. JA 425.

Hamill told the investigator that he would contact Sandy "for an update."
JA 842, 848. Hamill called Sandy, and at that time, determined that she had
witnessed the shooting. JA 241. He arranged to pick her up and take her to
homicide detectives for an interview. JA 241.

Homicide detectives Edward Tarney and Richard Fallin interviewed Sandy
later in the day of May 25, 1994. She described what happened, and told them that
a person she knew as "Eric" was one of the two gunmen. Fallin and Tarney did
not take a signed statement from Sandy, however, Fallin's notes of the interview
indicated that Sandy described Eric as a black male, approximately 25 years of
age. JA 815-816. She estimated he was six feet tall and weighed 165 to 170
pounds. JA 815-816. She said he had light skin, low cut hair, and heavy

6

eyebrows.  JA 816.  110, 331.    However, she never mentioned Lynn as having a

beard or moustache.  JA. 816.

Sandy described Eric as a "friend," whom she knew for about 1 ½ years.  JA

214, 239.  She said Eric frequented the area of 14th and Merrimac, which is a drug

plagued section of Langley Park.  JA 110.  She met with Eric on approximately

10-15 occasions.  JA 130, 214, 743.  There were other occasions, where she

merely saw him, but did not speak with him.  JA 228.   On the occasions she met

with him, it was for the purpose of a drug transaction.  JA 743.

Despite her familiarity with "Eric," Sandy was unable to provide detectives

with sufficient information for them to develop a suspect.  Unable to locate and

identify "Eric" through information provided by Sandy, Detective Tarney resorted

to showing her photos of persons named Eric.  Tarney ran the name Eric through a

police computer, and came up with a number of people named Eric with whom the

police had previous contact.  JA 112, 945.  From that list he chose several

individuals, and obtained photographs of them. JA 945.

On May 30, 1994, a photo array was shown to Sandy.  JA 112-113.  Each

person in the photo array was simply a person named Eric who had previous

contact with the police.  JA 945.  Fallin and Tarney showed Sandy the photo array

as they sat in Tarney's car in front of the records section of the police department.

7

JA 113, 116.  Sandy made a "tentative" identification of Eric Lynn.  JA. 818.  She

told detectives that she was not sure of her identification because she did not

remember the beard and moustache which Lynn wore in the photograph.  JA 818.

Up to that date, Eric Lynn had not been developed as a suspect by the

police.  JA 344.  He was merely one of eight people named "Eric" in a photo array

which was shown to Sandy.  JA 316-317, 334-338.  When Sandy tentatively chose

Eric Lynn from this array, Tarney admitted "[w]e got lucky."  JA 338.

The photo which Sandy tentatively chose depicted Mr. Lynn with a distinct

moustache and goatee.  JA 207, 231.  He had the same facial hair in the

surveillance photos which were taken by the Montgomery County police just a

few days after the murder.   JA 208.   As stated above, Sandy's initial description

did not include facial hair.  JA 815-816.

Additionally, Sandy's initial description of 6 feet, 165-170 pounds did not

match Mr. Lynn's physical characteristics.  JA. 816-816.  Police records prepared

at the time of his arrest indicated that Eric Lynn was a slight individual, just 5' 8"

and 122 pounds.  JA 211.

Sandy's inability to accurately describe, and positively identify Eric Lynn

was a key indicator of Sandy's lack of credibility.  Sandy claimed to have known

"Eric" for years. JA 214, 239.  In addition to knowing "Eric," Sandy spent a

8

significant period of time with him on the night of the murder. JA 131. She spoke

with "Eric" in the 7-11 parking lot; she rode with him in the car to Hobson's

apartment; and, she stood with him in the apartment during the drug deal. JA 131,

368-372, 377-378. During all of this interaction, Sandy had a very good

opportunity to see Lynn. JA 393. However, she was unable to provide detective

with an accurate description, and was unable to positively identify Lynn from the

photo array.

In a continuing attempt to get a positive identification, Detective Tarney

decided to show additional photos of Mr. Lynn to Sandy. Tarney instructed ROPE

officers to take surveillance photographs of Mr. Lynn on June 1, 1994. JA 120,

208. On that same date, those photos were shown to Sandy at police headquarters.

JA 120, 208-109. Sandy was still unable to say whether Mr. Lynn was the person

she knew as Eric. JA 121.[1]

Nearly twenty days after Sandy's "tentative identification" the police

investigation had developed no independent corroboration of Sandy's unsteady

---

[1]Detective Fallin was unaware that Sandy had been show surveillance
photos before the subsequent show up identification procedure. JA 354. He
opined that it would have been improper to do so because of the potential for
suggestiveness. JA 354-355, 819-821.

accusation against Lynn.  In an attempt to get a positive identification, Tarney

decided to conduct a "show up" of Mr. Lynn.  JA 121.

On June 21, 1994 Tarney, Fallin, Hamill, narcotics Detective William

Whelan, and others, took Sandy to Eric Lynn's neighborhood in Landover,

Maryland.  JA 121, 209.  They gathered at a warehouse about one half mile from

Lynn's house.  JA121.  Tarney showed a narcotics officer where Mr. Lynn lived,

and surveillance was set up on Lynn's house.  JA 122.  Fallin, Whalen and Hamill

drove Sandy around the neighborhood, asking her to tell them if she saw Eric.  JA

121-122 234.  Surveillance officers saw Mr. Lynn arrive at his home, and Sandy

was brought to that location.  121-122.  They pulled next to Mr. Lynn's vehicle, at

which time Sandy identified him.   JA 234, JA 351.

Prior to making this "positive identification" Sandy had been shown

photographs of Eric Lynn on at least two occasions.  At the outset of the

identification procedure, Sandy knew they were going to the neighborhood where

the person depicted in the photo array and surveillance photos lived.  JA 132, 233.

She knew that she was being taken to the area to identify the person she had seen

in those photos.  JA. 408-409.

Under the circumstances, Sandy's identification was in serious doubt.  Her

credibility was questionable from the outset of the investigation, not only because

of her lifestyle, but also because she was arguably an accomplice who fled the scene of a murder. Her inability to positively identify a person whom she supposedly knew raised additional doubt about her credibility. Finally, the suggestiveness of the identification procedure itself raised additional concerns about the accuracy of her identification of Lynn. It this context which made the payments to Sandy by police so pernicious.

**B. SANDY WAS PAID FOR HER COOPERATION IN THE HOMICIDE CASE**

### 1. THE PAYMENT "SYSTEM"

The officer's deny that Sandy was paid for her cooperation in the homicide case. They describe a "system" which was set up before Sandy became a witness. Appellant's Brief, at 5-6. They contend that the payments made to Sandy during the course of the homicide investigation were merely compensation which was due to Sandy as a result of narcotics work performed by her before the murder. Id. They state that "through this system, Sandy was paid before and after she became a witness in the murder investigation, but the payments were for work she performed for narcotics officers." Appellant's Brief, at 6.

The true purpose of the payments made to Sandy during the homicide investigation is perhaps the most vigorously contested fact in this case. Mr. Lynn

11

has staunchly maintained that the payments were intended to secure Sandy's cooperation in the homicide case, and that the "system" on which the officers rely to justify the payments was nothing more than a convenient subterfuge to conceal their own misconduct. His argument is well supported by the facts.

In her capacity as a confidential informant for Detective Hamill, Sandy's job was to purchase drugs. She would perform a "controlled buy," under the observation of the police, and then the sellers would be arrested. JA 380, 389-390, 721-723, 754-755. Sandy never testified in relation to any of her narcotics work. JA 778.

Sandy was paid for performing these controlled buys. JA. 723. The amount Sandy received depended on the outcome of the arrest and search following the buy. JA. 723. Sandy did not get paid for providing mere information to police. JA 738, 755. She was paid for things she did which led to an arrest or search. JA 755. If she provided information to police about someone selling drugs, they would then set up a controlled buy, for which she would be paid. JA 752-755.

There was a system in place for the acquisition of funds from the police department, however, the decision as to how those funds would be paid to Sandy rested solely with Detective Hamill. JA. 776. This system was adequate to track

12

the expenditure of funds, but it was hardly a system which assured that the funds were paid only for their approved purpose.

Under the procedure which was in place prior to the murder, Hamill would typically draft a memorandum requesting a sum of money, between $250 and $1000, to be paid to Sandy.  JA. 561, 579, 591, 603, 636, 640, 673.  This memorandum included a narrative summary of Sandy's past work which justified the request for funds.  Id.  The summary usually included her work on a number of cases.  Id.  The memorandum would be sent up the chain of command to a Captain who would approve the payment as a mere administrative duty.  JA 898.

After the funds were approved, Hamill decided when to pay Sandy, and how much to pay her.  JA. 415-417, 776.  He would dole the money out to Sandy in small increments.  JA 470, 899. The purpose of this was to keep Sandy working for the police.  JA 470, 486, 899.

Sandy was aware that the police paid her only when she did something for them, in order to assure she would continue to work for them.  JA 752.  But, she was never told specifically what she was being paid for.  JA 756.  Records show that she was regularly paid after performing a service for the police.  Although the payment may have been pre-approved for some prior service, Sandy's only concern was receiving the payment.  She stated "they did not tell me what I was being paid

13

for and they – I just accepted the money, signed the receipt because I received it."
JA 756.  The result of this system was that Sandy received incremental payments
which she did not attribute to any particular narcotics case.  She was aware that she
only received a payment after doing something for the police.  This was precisely
the effect the police wanted in order to keep Sandy productive.  JA 470, 486, 899.

Hamill admitted that the driving force behind Sandy's cooperation was
payments from the police.  JA. 486.  He understood that, if she was not paid, she
would not work for them.  JA. 486, 486.  Moreover, Hamill understood how
important the payments were to Sandy.   Hamill knew that Sandy was a drug addict,
and that Sandy was dependant on payments from police.  JA 389, 740, 757.   He
testified that he paid Sandy for her narcotics work in small increments "to keep her
working with us."  JA 470.

Because the payment system was devoid of any real guidelines or restraints,
it served as a convenient conduit for paying Sandy for her cooperation on the
homicide case.  The system provided both a source of funds, and a cover for the
officer's misconduct.

14

### 2. THE PAYMENTS

Sandy stopped working as a narcotics informant after she became a witness to the homicide, however, the police continued to pay her drug enforcement funds in order to assure her cooperation on the homicide case.

Sandy's activities, and the payments made to her are documented in her confidential informant file. *See*, JA 662-692. That file included several types of documentation. "Special Informant Contact Reports" and an "Informant Control Log" detailed the nature of the interaction between Sandy and police on a particular date. "Informant Payment Receipts" documented the amount of money paid to Sandy on a particular date. The file also included memorandum which operated as requests for payment by Detective Hamill to his superiors.

These documents demonstrate that Sandy received $1,190 from the police between the time of the murder to just after Lynn's trial. JA 662-692. During that time, she did not perform any work on narcotics cases, and all of her contacts with police involved the homicide investigation. Id. Most of the payments made to Sandy during this time period coincided with critical events in the homicide investigation. Id.

Sandy did not do any narcotics work for Hamill following the homicide. JA 147. The primary reasons for this was that the police did not want to jeopardize a

15

witness to a homicide.  JA. 473-475, 781-782.  Sandy's main utility for the police

was making controlled buys.  JA 472-473.  After she became a witness in the

murder, Sandy could not do controlled buys for the police because of the risk

involved.  JA 472-473.  In fact, after the homicide investigation began, Sandy did

not do another controlled buy for over two years.  JA. 780, 782-783.  During the

pendency of the homicide investigation, there were no search warrants served as a

result of anything Sandy said or did.  JA. 475, 784.  There were no arrests made on

the basis of anything Sandy said or did from the time the homicide investigation

started until 1996.  JA. 457, 780-781, 786.[2]

Sandy testified that all of her contact with the police after March 25, 1994

had to do with the homicide investigation, and not her narcotics work.  JA 759.

Sandy was shown records of each of the payment made to her during the pendency

of the homicide investigation.  JA 756, 760.  She could not describe what narcotics

work was done to earn any of the payments.  JA 756, 760.  She was not concerned

---

[2]The fact that police stopped using Sandy for narcotics work after she became a witness in the homicide is documented by the informant control log.  JA 685, *et. seq.*  That document showed contact with the police on 7 occasions between the murder and Mr. Lynn's trial.  JA. 692.  It stated that Sandy either "provided information on the Piney Branch murder," or simply received a payment on 5/25/94, 6/1/94, 6/2/94, 6/10/94, 6/21/94, 7/22/94 and 9/28/94.  However, it did not contain a single reference to any narcotics work during that time period.  JA. 494-495.

with what the police wrote on the forms as a justification for the money, as long as she got the money.  JA 771.

Despite the fact that Sandy was not working as an informant after May 25, 1994, Hamill continued to pay her.  The confidential informant file documents Sandy's initial meeting with police on May 25, 1994.  JA 664-667.  The records reflect that Detective Hamill paid Sandy $140 on that date.  Hamill wrote a Special Informant Contact Report dated May 25, 1994 that indicated that the payment was for "services rendered."  JA 664.  The "services" are not particularized on the report.  An Informant Control Log, stated the following: "Info. on murder on Piney Branch," and that "information only" was provided.  JA 692.  There is no indication that Sandy made any "controlled buys" of narcotics or that anyone was arrested as a result of anything she did, or information she gave.  There is, however, a reference to local investigation number 91-261 on the payment receipt. JA 667.[3]

---

[3]The informant payment receipt for May 25, 1994 references local investigation No. 91-261.  JA. 667.  The reference to this case number as a justification for a payment at a time when Sandy was not performing narcotics work is an example of how the payment authorization system was used as a cover to pay Sandy for her cooperation on the homicide case.

The control log indicates that investigation no. 91-261 involved an investigation at 13126 Superior Street.  JA 690.  Sandy made a controlled buy at that location on March 10, 1993.  JA 627, 690.  She conducted another controlled buy at that location on April 13, 1993, prior to the execution of a search warrant.

Hamill testified that he made this payment to Sandy because he owed it to

her as a final installment of a payment which had been previously approved.  JA

_____

JA. 628, 690.  On that same day, seven people were arrested at the residence,
including Carol McNight.  JA 690, 641.

     On July 20, 1993, Hamill was authorized to pay $700 in increments for her
work on 91-261, and several other cases.  JA 637.  Hamill then began paying
Sandy, ostensibly for 91-261 and other previous cases, in June, 1993.  Although
payment receipts indicate that the payments are for 91-261, there at least five other
cases which formed the basis of the $700 authorization.  The case numbers for
those cases are not indicated in any of the payment receipts.  Moreover, each of
the payments for 91-261 occurred on days that Sandy did narcotics work for the
police.  This made it impossible for Sandy or the officers to know precisely what
she was being paid for.  In reality, neither Sandy nor the officers cared why the
payments had been authorized.  Both the officers and Sandy knew that she would
not be paid anything unless she continued to work with the police.  The approved
payments were doled out as current work was performed.  Each payment was
intentionally and inextricably linked with the services that Sandy was currently
providing to the police.

     Following the July 23, 1993 authorization for $700, Sandy received several
payments, with each payment being made following work with the police.  On
November 30, 1993 she received $100 for LI 91-261.  JA 650.  That payment was
given to Sandy on the same day she pointed out a house where a search warrant
was served in a case unrelated to 91-261.  JA 646-649.  On January 11, 1994,
Sandy was paid an additional $150 for 91-261.  JA 117.  This money was paid on
the same day she made a controlled buy in a case unrelated to 91-261. JA 116.  On
January 21, 1994, Sandy was paid an additional $60 for 91-261.  JA 656-657.
This was paid on the same day Sandy made a controlled buy in an unrelated case.
JA 655.  On April 4, 1994, Sandy was paid an additional $100 from the approved
$700.  JA 125.  This was paid on the same day Sandy made two controlled buys in
an unrelated case.  JA 125.

     The final payment of the approved $700 was made on May 25, 1994.  JA
664.  This was paid on the same day Sandy was interviewed by homicide
detectives.  She did not do a controlled buy, or any other narcotics work on that
case that day.  JA 664-667.   The police were paying Sandy not because they owed
her money, but because she was cooperative

775-777.  Indeed, on July 20, 1993, Hamill was authorized to pay $700 in

increments for her work on 91-261, and several other cases.  JA 637.  The control

log indicates that Sandy last performed work on LI 91-261 on April 13, 1993, more

than 11-months earlier.  JA 690.  Moreover, the records indicate that Sandy had

been paid over $560 for that case (and other cases involved in the same approval of

funds) up to that date.  Nevertheless, Detective Hamill used his discretion to pay

Sandy an additional $140 after Sandy cooperated with the homicide detectives.

Hamill admitted he did not have to pay Sandy $140 on the first day of her

contact with police regarding the homicide.  JA. 776.  He admitted that she did not

do any narcotics work that day, and he could have waited to see how the homicide

investigation played out.  JA 777, 789.  However, he explained that he felt she was

owed this money for her past service, so "it wouldn't have been right" not to pay

her.  JA. 777.  He admitted there was no contract with Sandy, and he was under no

legal obligation to pay her.  JA. 777.  He did acknowledge that "there could be

problems" with paying a witness to a homicide case.  JA 778.

Sandy testified she could not recall what that payment $140 was for, but she

was sure it did not have anything to do with the murder.  JA 406-408.  Although

she speculated that it was possible that she did a controlled buy on the day before

19

the murder, the records showed she had not done any narcotics work since April 1, 1994.  JA 407, 662.

As the homicide investigation progressed, Hamill remained involved by acting as a conduit between Sandy and homicide detectives. On June 1, 1994, Hamill and narcotics Detective William Whelan, brought Sandy to the homicide division.  Tarney showed Sandy the surveillance photos which had been taken of Eric Lynn.  JA 668, 790. After speaking to detectives she went to try to identify a vehicle which police suspected was used in the murder.  JA 790.  She did no narcotics work on June 1, 1994, or on any of days subsequent to the murder.  JA 476, 790.

On June 7, 1994, Hamill again brought Sandy to the homicide detectives.  JA 669, 477.  The Informant Control Log states that Sandy provided "information on the murder on Piney Branch."  JA 690.  Sandy worked on a composite drawing of the suspect and Detective Tarney showed her more suspect photographs.  JA 669.[4]

On June 10, 1994, Hamill paid Sandy $50.  477-478, 670.  Hamill admitted that the  monies authorized by the July 20, 1994 memorandum had been expended by that date, and that this amount was not approved by a lieutenant, as was normal.

---

[4]Sandy also provided some information on an unrelated narcotics matter on this date.  JA 669.  Hamill testified that she was not compensated for this information. JA 791, 477.

20

JA. 478, 482.  He explained that the sergeant "apparently" had authority to approve

a "smaller amount of money."  JA. 478.  He could not recall what this $50 payment

was for.  JA. 478.  He noted that the case number on the payment record was 93-

944.  JA 478.  However, he admitted that the case number referenced on the

payment receipt (93-944) related to individuals who had been arrested on January

25, 1994.  JA. 479.  He further admitted that the special informant contact report

for June 10 did not indicate that Sandy had provided any information relating to

case number 93-944, or any other narcotics case.  JA. 481.  Hamill did not recall

telling Sandy what the payment was for.  JA. 491.

Despite the fact that Sandy had not done any narcotics work since the funds

approved by the July 20, 1994 memorandum were expended, and, despite the fact

that it was not expected that Sandy would perform any narcotics work during the

pendency of the homicide case, an additional request for funds was made by

memorandum dated June 17, 1994.  JA 673, 484.  Hamill's supervisor, Captain

McKenna, approved the payment of $1000 in increments.  JA 673-674.

On June 21, 1994, Hamill and Whelan transported Sandy to meet detectives

Tarney and Fallin for the "show up" identification procedure in which Sandy

ultimately identified Eric Lynn.  JA. 491, 676.  A special informant contact report

on the date of her identification of Lynn indicated that Sandy was paid $200 on that

21

date. The report also stated that $100 of that sum was paid by "H&S," which stands for Homicide and Sex division. Ex. 12, p. 139.

Details of this payment did not surface until the October, 2007 trial. At that proceeding, Hamill admitted that he paid Sandy $200 prior to the identification procedure, although he could not actually recall making the payment. JA 799. Detective Fallin recalled that Sandy was demanding money before she made the identification. JA 822. He testified: "That's what she wanted was money." JA 825. He further testified, "[i]f we hadn't given her the money, I don't know what she would have done." JA 823-824.

Fallin testified that he personally paid Sandy $100 of his own money because Hamill didn't have it (or apparently didn't have enough). 821-825. He acknowledged that he gave her money to keep her happy. Id.[5]

Hamill did not recall telling Sandy what the payment was for, but he admitted that the only activity she performed on that date was identifying Mr. Lynn. JA 491-492, 798. Sandy admitted that she received $200 on the date of the show up identification. JA. 410. However, she could not recall why she received

---

[5]Hamill admitted that Homicide was not authorized to pay Sandy for narcotics work, and that they were only authorized to pay witnesses on their own cases. JA. 800.

the payment.  JA. 411. Captain McKenna was asked about this payment.  He admitted that the "timing" of the payment was "not real good."  JA 911.[6]

On July 22, 1994, Sandy appeared in the State's Attorney office in connection with grand jury proceedings.  At that time, Detective Whelan paid Sandy $200.  JA 680.  He paid her in the lobby of the State's Attorney's office and in the presence of Edward Tarney, who signed the informant payment receipt as a witness.  JA 680, 882.

Whalen testified that he delivered the payment to Sandy at the request of Detective Hamill, who was on vacation.  JA. 873.  At the time of the payment, Whalen knew that Sandy was a witness in a homicide case.  JA. 873.  He did not divulge this payment to the State's Attorney's Office.  JA 876.  Again, as to this payment, Captain McKenna admitted that the timing was poor.  JA 913.

The impetus for this payment was revealed in notes taken by prosecutor David Boynton during a September, 1994 telephone conversation with Detective Tarney.  JA. 941.  Boynton explained that the purpose of Tarney's call was to see if Sandy could be paid, and he told Tarney she could not.  JA. 429.  Tarney advised Boynton that Sandy was "ticked off."  JA. 941.  She had appeared for grand jury

---

[6]Although he was present, and in the lead capacity at the show up identification, Tarney denied any knowledge of the payment.  App 978-979.

23

proceedings, at which time she told prosecutor John McCarthy that she "needed money." 941. "John said no" to this request. JA. 941.

The note went on to say that "Russ and Billy gave her money to make her happy." JA. 941. Boynton was told that the money given to Sandy by "Russ and Billy" was owed to her for her work on past narcotics cases. JA 430, 435, 448, 452. Boynton knew that Hamill distributed "drug enforcement money" to Sandy. JA 454. However, he testified that detectives told him that Sandy was not paid for her cooperation on the homicide case. JA 459-460. In his conversation with Tarney, Boynton reiterated McCarthy's instructions that Sandy could not be paid for her assistance on the case. JA 429, 441, 459-460.

However, unknown to Boynton, the detectives continued to pay Sandy for her cooperation on the homicide case. On September 28, 1994, Hamill and Whelan drove Sandy to Gentleman Jim's restaurant to meet with Boynton. JA. 802-803, 886. Hamill wrote a special informant contact report that indicated that Boynton, Hamill and Whelan asked Sandy questions about the Piney Branch murder. JA 681. Although Hamill could not recall the details of the meeting, Hamill admitted that he paid Sandy $100 either before or after the meeting. JA 489, 805. Boynton had no knowledge of the payment. JA. 452, 805.

24

Finally, on December 6, 1994 (nine days after Sandy testified against Lynn) Hamill paid her $500. JA 683. There was no case number placed on the associated paperwork, and Hamill could not recall whether he told Sandy what the payment was for. Significantly, this was the largest single payment Sandy ever received for any of her work with the police. JA 496, 537-693. Hamill admitted that this was a large payment. JA 496. He explained that he probably gave her such a large payment because he was being promoted to sergeant, and was leaving the unit. JA 496, 498.

Hamill's explanation for the size and timing of this last payment is contradicted by the facts. Sandy was described as the "most prolific informant" the drug enforcement unit ever had. JA. 449. Clearly, such a valuable resource would not be abandoned because an officer was being promoted. In fact, Hamill admitted that he hoped to "pass her along" to another officer if he did leave the unit. JA. 485. And, that is precisely what happened. The evidence showed that Sandy continued to be a working informant until 1996. JA. 474. Hamill admitted meeting with her as a Sergeant, although he was no longer working the cases as the primary investigator. JA. 498-499. If the police only wanted to keep Sandy as an informant, they would have strung her along by doling out the remaining $500 to

25

her over time.  Hamill paid the $500 to her all at once as a reward for her

cooperation in securing a conviction.

### C.     THE OFFICERS WILLFULLY CONCEALED THE PAYMENTS FROM THE PROSECUTION

The officers cite facts which suggest that the prosecutor, David Boynton,

was on notice of payments by police to Sandy.  Appellant's Brief, at 6-9.  While it

is true that Boynton was aware that Sandy was a paid narcotics informant, the fact

that she was paid for her cooperation on the homicide case was intentionally

concealed from him by the detectives.

Boynton testified that he was aware Sandy was a paid narcotics informant.

JA 430.   Boynton knew that Detective Hamill paid Sandy "based on her

information for drug cases," although he was not familiar with the details of the

payment process.  JA 452.  Boynton testified that he did not know "how it

happened, when it happened, and where it happened, how much it happened, I

didn't know anything about that."  JA 452.

Boynton was confident that the police were not paying Sandy for her

cooperation on the homicide case because the detectives told him that they did not

pay her for that purpose.  JA 459.  He also believed that detectives knew the policy

of his office not to pay witnesses.  App 449.  He testified that they "wouldn't,

26

didn't, couldn't pay... because there was–you don't pay people for their testimony. That's the bottom line." JA 450. Boynton noted that homicide did not even have a source of funds with which to pay an informant. JA 451.

During the criminal proceedings, Boynton was shown records indicating that Sandy had been paid by narcotics detectives at crucial points in the homicide investigation. He testified that he did not authorize the payments to Sandy and had no knowledge of them. JA 452.[7] He did not know Sandy was paid during her initial interview with homicide detectives on May 25, 1994. JA 452. He did not know that Detective Fallin had paid her $100 before she identified Mr. Lynn. JA 451. He did not know she was paid before or after her meeting with him on September 28, 1994. JA 452.

On September 27, 1994, Boynton had a telephone conversation with Detective Tarney. JA. 941. During that conversation, Tarney told Boynton that Sandy had asked to be paid for her cooperation when she appeared for Grand Jury proceedings. JA 48, 941. However, Tarney further advised that she was told at that time that she could not, and would not, be paid. JA. 450. Tarney also advised that narcotics officers had paid Sandy, but all that Boynton knew was that Sandy

---

[7]The Montgomery County Circuit Court found his testimony to be credible in that regard, and concluded that there was "no evidence which suggests ASA Boynton had any reason to suspect that she was being so paid." Ex. JA 512-513.

27

had been paid for past narcotics work.  JA 430, 435, 448, 452, 454.  During his

conversation with Tarney, Boynton reiterated that Sandy could not be paid for her

cooperation on the case. JA 429, 441, 459-460.[8]

Boynton's belief that Sandy was paid only for her work on narcotics cases

was manifest in his presentation of evidence at Mr. Lynn's first trial.  He called

Detective Hamill as a witness at that proceeding.  Hamill denied that he ever paid

Sandy for her cooperation on the homicide case.  JA 241.  He also denied that he

had ever promised her anything in exchange for her cooperation.  JA 242.  Boynton

made the same inquiry of Sandy, who also denied receiving any compensation for

her cooperation on the homicide case.  JA 238-239.  In closing argument, Boynton

touted Sandy's reliability, and challenged the idea that she might have been

influenced by a monetary incentive.  He stated as follows:

> Officer Hamill has never found [Sandy] to be unreliable in any of the
> circumstances that he has dealt with her.  Her information has led to
> over 20 search warrants that he has dealt with.
> She had worked with other officers in providing information.  She has
> a long track history of providing valid and reliable and accurate
> information, and even though there is an allusion in this case made by
> the defense that she had been paid in prior cases, she is not getting
> paid anything in this case.  There is no evidence of that.  She is doing
> this because she was a witness to a murder.  JA 253.

---

[8]Boynton did not consider her request for money to be <u>Brady</u> material
because she was told that she was not going to be paid.  JA 441.

28

Hamill's testimony at Mr. Lynn's trial was an extension of the detectives' attempts to conceal the fact that Sandy was being paid for her cooperation in the homicide case. Although Hamill candidly admitted that Sandy was paid for her narcotics work, he did not reveal the truth, i.e., that the money which had been approved for her narcotics work was being paid to her in a way that secured her assistance in Mr. Lynn's case.

The other detectives were equally untruthful in their early testimony. At the September 13, 2006 hearing on the defendant's motion to suppress, the defendant alleged that Detective Tarney intentionally misled the magistrate in an application for search warrant by omitting from his warrant application the fact that Sandy was a paid informant. JA. 968. At that hearing, Tarney denied any knowledge that Sandy was a paid informant at the time he applied for the warrant. JA. 342. In fact, he denied having knowledge that Sandy was a paid informant at any point in the homicide investigation. JA 311, 342-343.

At a hearing in July, 2007, Detective Tarney was confronted with records from Sandy's CI file. At that time, he testified that he knew from the inception of the investigation that Sandy was a paid informant. JA. 967. He further admitted that he was present when Sandy was paid on July 22, 1994. JA. 967, 975-976. Tarney could not explain the inconsistency in his testimony. 970-971.

29

Detective Fallin was caught in a similar lie.  At a hearing in September, 2006, Fallin testified that he knew Sandy was an informant.  JA 963.  However, he denied knowing that she was a paid informant.   JA 963.  He also denied that she was ever paid in his presence.  JA. 827.

At the 2007 trial, Fallin contradicted all of his previous testimony regarding Sandy's status as a confidential informer.  JA. 814, et seq.   When confronted with the record of the payment made on the date of the show-up procedure, Fallin admitted that he was the homicide detective who paid her $100 on that day.  JA 821.  He testified that Sandy was demanding money.  He was concerned that, "if we hadn't given her the money, I don't know what she would've done." JA. 824.  So, he gave her money "[t]rying to keep her happy." JA. 824.  He testified that he has cash on him from "a little home improvement company" which he was involved in, and he handed that money to her.  JA. 824.  After she was paid, Sandy became cooperative.  JA. 825.

Although Whelan was present in the vehicle when Sandy was paid by Fallin, he denied remembering that Sandy had requested or received any money.  JA. 871.  He agreed that the fact that she was paid at the time of the identification should be divulged as exculpatory evidence.  JA 871.  However, he did not disclose any such

30

information to the prosecutor. JA 871-872. Similarly, Detective Whelan did not disclose the payment he made to Sandy at the time of the Grand Jury. JA 876.

## II.    SUMMARY OF ARGUMENT

The officers paid Sandy, a key prosecution witness, numerous times for her cooperation in Lynn's murder case. These payments coincided with critical events in the homicide prosecution, and were intended to secure her continued cooperation. The officers divulged to the prosecutor the fact that Sandy was a paid narcotics informant, and that information was properly divulged to the defense. However, the officers withheld details of the payments made during the homicide prosecution and the true intent of the payments. The officers were keenly aware of the exculpatory nature of the payment information. They were also aware that the payments were made against the explicit instructions and policy of the prosecutor's office. They lied under oath about having made the payments, and attempted to cover their misconduct by relying on misleading documentation.

The officers conduct was a constitutional violation because the they intentionally withheld the exculpatory payment information from the prosecution. Although it is the primary duty of the prosecutor to disclose exculpatory information to a defendant in a criminal case, officers may not intentionally withhold such evidence from the prosecutor under the Due Process Clause,

31

according to this Court's precedents.  Because there are sufficient facts from which the jury could infer an intentional withholding of exculpatory evidence, Lynn has established that the officers' conduct violated constitutional rights.

The officers do not have qualified immunity for their actions.  At the time of Lynn's trial, the case law in the Fourth Circuit  provided ample notice to police officers that they can be subject to monetary damages under section 1983 for failure to disclose exculpatory evidence to the prosecutor.

## III.  ARGUMENT

### STANDARD OF REVIEW

The Court reviews <u>de novo</u> the district court's denial of qualified immunity. <u>Wilson v. Kittoe</u>, 337 F.3d 392, 397 (4th Cir. 392).  When considering an appeal of a denial of qualified immunity, the Court is required to consider the facts "in the light most favorable to the party asserting the injury."  <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001).

A.    **THE EVIDENCE PRESENTED SHOWS THAT THE OFFICERS DELIBERATELY WITHHELD EXCULPATORY INFORMATION FROM THE PROSECUTOR IN VIOLATION OF LYNN'S RIGHT UNDER THE DUE PROCESS CLAUSE.**

1.    **Under § 1983, the Officers Can Be Held Liable for Withholding Exculpatory Evidence From the Prosecutor, Notwithstanding the Primacy of the Prosecutor's Duty under <u>Brady</u> to Disclose the Evidence Directly to the Accused.**

A police officer cannot be shielded from liability under § 1983 when he withholds exculpatory evidence from the prosecutor.  It makes no difference that the prosecutor, not the police officer, has the primary job to deliver exculpatory evidence to the defendant.   Where a prosecutor is unable to supply exculpatory evidence to the accused because of a police officer's deliberate decision to withhold it, § 1983, by its terms, permits liability against the officer.

Section 1983 states: "Every person who, under the color of any statute...subjects, or causes to be subjected and citizen of the united states or other person...shall be liable to the party injured in an action at law...."  Thus, under the plain language of the statue, an officer's failure to disclose exculpatory evidence to a prosecutor can subject him to liability where it is a cause of the prosecutor's failure to disclose exculpatory evidence to the accused, which results in a deprivation of right to a fair trial and loss of liberty under the Due Process Clause.

33

_____This was the holding in Goodwin v. Metts, 885 F.2d 157 (1989).  In

Goodwin, officers charged Goodwin and Hallman with breaking into the house of

Bishop, who was their employer.  Sheriff deputy Maxwell charged the men largely

on a statement from "Terry Nelson."  Sheriff deputies  learned that "Nelson" had

provided a false name and the officers were unable to locate him.

About a month before Goodwin and Hallman's trial, Maxwell learned that

one Stafford had confessed to a series of break-ins at Bishop's house.  Stafford's

confessions were consistent with details of the crime.  Maxwell prepared a report

on the Bishop's break-ins, including the one with which Goodwin and Hallman

were charged, indicating that all of the break-ins had been "cleared" by Stafford's

confession. He added Stafford's name as a suspect to an incident report concerning

the break-in for which Goodman and Hallman were about to stand trial.

The County Solicitor refused to prosecute the case due to its weakness.

However, Bishop's lawyer was allowed to prosecute the charges.

In preparation for trial, the prosecuting attorney met with Maxwell, who did

not mention that Stafford had confessed to the break-in for which Goodman and

Hallman were charged.  Maxwell also did not disclose that he had cleared the

Goodwin-Hallman case by attributing the break-in to Stafford only two weeks

earlier.

34

Goodwin and Hallman sued Maxwell and his boss, Metts, the Sheriff of the county, for wrongful arrest and wrongful prosecution under § 1983. A jury returned a verdict against Maxwell on the § 1983 claims.

On appeal, Maxwell argued that his motion notwithstanding the verdict should have been granted because "his duty extended only to an initial determination of probable cause and did not include any obligation to disclose exculpatory information acquired after the initiation of criminal proceedings." Id., 161. He also argued that, under state law, only the prosecutor had the authority to terminate the proceedings and, therefore, he could not be legally responsible for the continuation of the prosecution. The Court rejected these arguments.

The Court ruled that Maxwell "assisted in the actionable continuation of the prosecution of Goodwin and Hallman," id., 161, and "[t]he jury could reasonably infer that, had the private prosecutor been told of the facts negating probable cause, he would have declined to prosecute, and the solicitor would have nol prossed the case," id." The fact that only the solicitor had the sole power to drop the criminal prosecution did not insulate Maxwell from liability under § 1983. The Court stated, id., 162:

> [Maxwell] could be found liable for continuation of the prosecution if the deliberations of the private prosecutor were in some way tainted by his actions. A police officer who withholds exculpatory evidence

35

from the prosecutor can be liable under both section 1983 and the state common law. The issue is <u>causation</u>.

(Emphasis added.)(Citation and quotation marks excluded.) On causation, the

Court quoted at length from Judge Posner's opinion in <u>Jones v. City of Chicago</u>,

856 F.2d 985 (7th Cir. 1988):

> In constitutional-tort cases as in other cases, "a man [is] responsible for the natural consequences of his actions." <u>Monroe v. Pape</u>, 365 U.S. 167, 187 (1961). This principle led the Supreme Court in <u>Malley v. Briggs</u>, 475 U.S. 335, 106 S. Ct 1092, 89 L. Ed 271 (1986), to hold that the issuance of an arrest warrant will not shield the police officer who applied for the warrant from liability for false arrest if "a reasonably well-trained officer in [his] position would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant. Id. at 345, 106 S. Ct. At 1098.  The Court was speaking of immunity but its discussion is equally relevant to causation .... By parallel reasoning, a prosecutor's decision to charge, a grand jury's decision to indict, a prosecutor's decision not to drop charges but to proceed to trial – none of these decisions will shield a police officer who deliberately supplied misleading information that influenced the decision.

885 F.2d at 162.  The Court then held, <u>id</u>., 162-63:

> "A person who places before a prosecuting officer information upon which criminal proceedings are begun, and who later acquires additional information casting doubt upon the accused's guilt, should be under an obligation to disclose his discovery to the prosecutor." ... Maxwell cannot escape liability merely because he could not have unilaterally have terminated the prosecution of Goodwin and Hallman. A jury could reasonably find that his actions and omissions caused the two men unfairly to be subjected to a criminal trial.

(Quoting <u>Clarke v. Montgomery Ward & Co.</u>, 298 F.2d 346, 348 (4th Cir. 1962).

From these principles it follows that, if a police officer withholds from the prosecutor exculpatory evidence which results in the accused not receiving a fair trial, the officer's actions are the cause of the violation of the accused's right to due process of law, and the officer is not shielded from liability under § 1983.

> **2.  The Officers Were Keenly Aware of the Exculpatory Nature and Significance of the Payments to Sandy and Withheld the Evidence from the Prosecutor Intentionally.**

The Court's most recent opinion dealing with the standards for assessing an officer's liability for withholding exculpatory evidence is <u>Jean v. Collins</u>, 221 F.3d 656 (4th Cir. 2000)(<u>en banc</u>).  As an en banc decision by an equally divided court, the case is of questionable precedential value.[9]  However, that case clearly identified two distinct standards of liability.  Under either standard, the officers in the case at bar are liable.

---

[9] <u>Jean v. Collins</u>, <u>supra</u>, is a decision that has no precedential weight because the court was evenly divided.  <u>See</u>, <u>Arkansas Writer's Project, Inc. v. Ragland</u>, 481 U.S. 221. 234, n. 7 (1987)("an affirmance by an equally divided court is not entitled to precedential weight")(<u>citing</u> <u>Neil v. Biggers</u>, 409 U.S. 188, 192 (1972).  <u>See also</u>, <u>Hamrick v. United States</u>, 43 F.3d 877, 891, n. 3 (4th Cir. 1995).  Yet whether one follows the views of the judges who voted to affirm the judgment in favor of the police officers or those who dissented, the facts presented in Lynn's favor prove, under either view, that the officers withheld exculpatory evidence in violation of Lynn's due process right and are subject to damages under § 1983.

37

In <u>Jean</u>, <u>supra</u>. the Court addressed whether the officers' failure to disclose hypnosis related evidence to the prosecutor was actionable under § 1983. Six judges voted to affirm a district court's grant of summary judgment to the police officers. In the opinion of those judges, a § 1983 claim against a police officer for withholding evidence from the prosecutor under the Due Process Clause of the Fourteenth Amendment must allege "an actual bad faith deprivation of due process ...," <u>id</u>., 662. They explained that by "bad faith" they meant that the officer "intentionally withheld the [exculpatory] evidence for the purpose of depriving the plaintiff of the use of that evidence at trial." <u>Id</u>., 663. To those judges, a negligent failure to disclose exculpatory evidence does not constitute "bad faith" because it does not resemble "the kind of affirmative misuse of power that the Supreme Court has indicated would implicate due process protections." <u>Id</u>. Because six of the judges ruled that Jean was unable to provide evidence of a bad faith deprivation carried out by the officers, those judges voted to affirm the grant of summary judgment to the officers.

To the dissenting judges, "[i]f the State has failed to disclose <u>patently</u> exculpatory evidence, the incarceration occurred 'without due process of law" regardless of the good faith or bad faith of the non-disclosing official." 221 F.2d at 674. (<u>Citing</u> <u>Brady v. Maryland</u>, 373 U.S. 83 (1963). The dissent agreed that to

38

qualify as a due process violation, there must be a police "action that is more than merely negligent – an act that involves the willful, intentional use of government power to invade some protected life, liberty, or property interest possessed by its citizens." Id., 673. However, the right violated under the Due Process Clause was not "some freestanding procedural interest in exculpatory evidence," id., 677, but the "harm endured was the deprivation of his liberty without due process of law," id. To the dissent, id., 676-77:

> When police officers maliciously withhold exculpatory evidence from prosecutors, this violates the Due Process Clause because it denies criminal defendants a "fair trial" – not because it creates tortious interference with a liberty interest in exculpatory evidence.

In the case at bar, the officers conduct satisfied either standard for the imposition of liability. The evidence demonstrates that the officers in the case at bar acted in "bad faith." Unlike the facts in Jean, where there was no "evidence showing that the officers knew of the significance" of the withheld material, id., 662, the payments to Sandy were made by the officers for the express purpose of securing her cooperation in the homicide prosecution. The exculpatory nature of such evidence is patently obvious.[10]

---

[10] In Giglio v. United States, 405 U.S. 150, 153-54 (1972), the Court stated that "when the reliability of a given witness may well be determinative of guilt or innocense, nondisclosure of evidence affecting credibility falls within this general rule [of Brady v. Maryland, 373 U.S. 83 (1963)]."

This is made clear by the timing of the payments. Sandy was paid $140 at her initial meeting with homicide prosecutors. She was paid $200 when she identified Lynn at a show up identification. She was paid $200 for a grand jury appearance. She was paid $100 when she was taken to meet with the prosecutor in preparation for trial. And, she was paid $500 a few days after she testified against Lynn at his criminal trial. The timing of each payment coincided precisely with critical events in the homicide prosecution. The evidence was patently exculpatory and should have been turned over to the prosecutor, and the officers knew it.[11]

Bad faith was also demonstrated by the detectives' successful attempts to hide the payments from the prosecution and defense. For example, Hamill testified at Lynn's first trial that Sandy had never been paid for her cooperation on the homicide case. A full disclosure of the payments made to Sandy during the murder investigation, as well as the fact that she had ceased working as a drug informant,

---

[11] Lynn offered evidence from a police practices expert, Lou Reiter, who has been actively involved in law enforcement since 1961 and served as a deputy chief of police for Los Angeles, California. JA 915, 917. Reiter stated that "[i]n the 1980's law enforcement recognized the legality and reasonableness of the principles behind the Brady and Giglio cases .... Any reasonable and professional police officer would have known what would constitute exculpatory evidence and that it would be unlawful, unethical and unprofessional to hide or purposely withhold exculpatory evidence from the prosecutor." JA 927. After reviewing the evidence, he concluded that the officers "made conscious choices to manipulate the discovery process and withhold significant and relevant exculpatory evidence from Eric Lynn's criminal defense." JA 937.

would have rendered his testimony absurdly untrue.  It may be inferred that Hamill did not reveal the information to the prosecutor for this reason.

Similarly, Detectives Tarney and Fallin denied any knowledge of payments, despite evidence to the contrary.  In early proceedings, both detectives claimed no knowledge that Sandy was even paid as a narcotics informant.  Both detectives were later forced to a knowledge that they had actually paid Sandy, or had seen her paid in their presence.

The officers' decision to withheld the information from the prosecutor was willful, as the district court concluded.[12]  It may be inferred that they made a conscious decision to keep what they were doing hidden from Boynton, who had made it known that witnesses in a murder case cannot be paid.  In order to achieve this goal, they relied on the system which was in place for the payment of narcotics informants.  While that system provided both a source of funding, and a convincing

_____

[12]  The district court's determination that the officers withheld exculpatory evidence willfully is a determination that the officers engaged in particular conduct, and is not subject to interlocutory appeal.  As the Supreme Court in <u>Behrens v. Pelletier</u>, 516 US. 299, 312-13 (1996) explained: "determinations of evidentiary sufficiency at summary judgment are not immediately appealable merely because they arise in a qualified immunity case; if what is at issue in the sufficiency determination is nothing more than whether the evidence could support a finding that particular conduct occurred, the question decided is not truly "separable" from the plaintiff's claim, and hence there is no final decision ...."

paper trial, it was nothing more than a ruse because the true purpose of the

payments was not narcotics.[13]

The facts in this case also support imposition of liability under the standards

adopted by the dissent in Jean.  The dissent required more than mere negligence,

i.e., a deliberate withholding of clearly exculpatory evidence.  Lynn meets this

requirement by proving that the evidence meets the more stringent "bad faith"

standard.

> **3.      Disclosure that Sandy was a Paid Informant in Narcotics
> Cases, But Without Disclosing That the Officers Had Paid
> Sandy Numerous Times for her Information and
> Cooperation in the Murder Case, Caused Lynn to be
> Subjected to a Violation of the  Due Process Clause's
> Guarantee of a Fair Trial.**

The officers admit that they never told the prosecutor that they had paid

Sandy numerous times for her information and cooperation against Lynn.[14]  They

_____

[13]  The Officer's Statement of Facts continues to propagate the fiction that
the payments to Sandy were "drug information payments," and that "Sandy was
not paid for any information in the murder investigation. Brief, p. 6. They should
at least recognize that their assertions are disputed and respect that the facts, for
purposes of this appeal, should be viewed in the light most favorable to Lynn.

[14]  Non-disclosure to the prosecutor was admitted by the officers.  "THE
COURT: Is there any evidence that any of the officers told the prosecution, not
only are we paying her, but by the way we're paying her while this prosecution is
going on.  Do you know that?  Did they tell Boynton that?   MS. VIA: No."
JA 993. In addition, Hamill was asked if he told the prosecutor about the
payments; he replied that he could not recall.  Ex. 7, pp. 170, l.18 and 174,  and

only told Boynton that she was a paid confidential police informant in drug cases.

They argue this was enough to satisfy any obligation they had to provide exculpatory evidence to the prosecutor. It was not enough. In the context in which the payments were made, the officers' limited disclosure was untruthful and misleading, because it did not reveal the evidence that was most damaging to Sandy's credibility. The officers never revealed that they paid Sandy when she met with detectives in the homicide case, when she positively identified Lynn as a suspect, when she appeared for the grand jury, when she met with the prosecutor a month before trial, and when she testified against Lynn.

The non-disclosure of such patently exculpatory evidence was neither accidental nor purely negligent. The officers knew that there was a policy against paying witnesses in a homicide case. In keeping with that policy, the officers were specifically told that Sandy could not be paid for her cooperation on the case. The officers understood that the prosecutors would expect them to comply with their instructions in that regard. Under the circumstances, the officers disclosure that Sandy was being paid only for narcotics work was misleading, and would not have

---

Ex. 16, p. 260. Whelan, too, could not recall ever speaking to Boynton or telling him about any payments, although he was present when Sandy was paid $200 at the time of her identification of Lynn and when she was paid $100 after meeting Boynton. Ex. 19, pp. 44, 51.

put Boynton on notice of the truth, i.e., that the officers were surreptitiously paying her for a corrupt purpose.

To Boynton, paying a witness in a homicide case was something that just wasn't done. He trusted the officers' representations that Sandy was paid as a confidential informant in narcotics cases. He knew that, in such cases, Sandy would never have to appear in court, and that her identity was kept confidential. JA 60. But, as a witness in a homicide case, he knew that Sandy would have to testify in court. To him, that was "a totally different thing." JA 60. The rules were different, and he made it clear to Sandy and the officers that she could not be paid for being a witness in the murder case. JA 60. For the officers to violate his instructions, and actively pay Sandy for her information and cooperation in the murder case, was not something he could have anticipated.

The officers argue that Boynton should have done more to assure that he received all relevant information relating to Sandy's credibility. However, they do not say what more Boynton could or should have done. Boynton was dealing with a sensitive area of police work: the care and handling of informants. He testified that it was routine for detectives to guard the details of their contact with informants in order to assure the informant's confidentiality and safety. JA 448.

This necessitated a degree of trust between the prosecutor must and the officers who handle informants. In this context, the limited disclosure of Sandy's status as a paid informant in narcotics cases did not put Boynton on notice that the officers were engaged in the untoward act of paying a witness in a murder case for her information and cooperation as a witness. JA 448. In this case, the homicide investigators actually made and witnessed payments directly to the witness for specifics tasks she accomplished at their request. No prosecutor could be expected to divine that officers were acting with such utter disregard of his instructions and policy.

The officers argue that the defendant was put on notice of Sandy's status as a paid informant, and that such notification satisfied their obligations under the Due Process Clause. The disclosure of Sandy's status as a paid informant in narcotics cases, had only a small potential for impeaching Sandy's credibility or providing a motive to Sandy to falsify her testimony. The prosecutor made clear in his closing argument at trial that Sandy was not paid for her cooperation against Lynn and for that reason her account was worthy of belief. This is convincing proof that the disclosure of Sandy's status as a paid informant in drug cases was no substitute for full disclosure of the numerous payments to Sandy which persuasively

45

demonstrated that she was paid for her information and cooperation in the murder case.

### 4.    The Exculpatory Evidence Which the Officers Withheld Was Not Available to Lynn and It Did Not Lie in a Source Where it was Reasonable for Him to Look.

The officers argue that <u>Brady</u> does not apply "where the exculpatory information is not only available to the defendant but also lies in a source where a reasonable defendant would have looked ...." <u>United States v. Wilson</u>, 901 F.2d 378, 381 (4th Cir. 1990). They assert that Lynn's lawyer was informed before the first trial that Sandy was paid confidential informant in drug cases, and that he did not conduct an appropriate cross-examination of Sandy or Hamill to reveal Sandy's payment history. This misses the point. Lynn's defense counsel was aware that Sandy was a paid informant, but he told she was paid for her cooperation in narcotics cases only. Although he cross examined on this point, both Hamill and Sandy denied that she was paid for her cooperation on the homicide case. Therefore, the exculpatory information was not readily available to the defendant from those witnesses; nor did it lie within a source where a reasonable defendant would have looked.

Aside from the issue of his counsel's effectiveness, Lynn was legally entitled under <u>Brady</u> to receive material, exculpatory evidence for his trial and he didn't get

46

it.  In a pretrial request for discovery, he had requested to know the identity of "all persons who ... have been offered ... agreements in return for testimony, information or documents."  JA 949.  He also requested "exculpatory evidence" to include evidence "impeaching the credibility of any ... witness ...."  JA 957.

Lynn's entitlement to exculpatory evidence did not depend on his attorney filing a motion to get the exculpatory evidence, conducting additional investigation of Sandy, or doing anything else.  Additionally, the Maryland rules of procedure at the time required the State to disclose, without request, relevant information regarding a pretrial identification to the accused.  Rule 4-263 (a)(2).  As the circuit court noted, the fact that "Sandy received payments during the pendency of the homicide investigation goes to her credibility and was therefore material to her identification of the defendant."  Thus, it was the State's duty to furnish exculpatory evidence to Lynn.  The defense lawyer's alleged ineffectiveness was irrelevant to Lynn's entitlement to the evidence, and does not shield the officers from liability under § 1983 where there concealment of exculpatory evidence is instrumental to depriving Lynn of such evidence at his trial.

47

**B.     THE OFFICERS ARE NOT ENTITLED TO QUALIFIED IMMUNITY BECAUSE THE DUTY ON THE PART OF THE POLICE TO TURN OVER EXCULPATORY EVIDENCE TO THE PROSECUTOR WAS CLEARLY ESTABLISHED.**

Under the precedents in this circuit as they existed at the time of Lynn's trial in 1994, the officers would have known that they had a duty under the constitution to turn over to the prosecutor the information that they made payments to Sandy in the course of the murder case as well as the nefarious purpose why they made the payments.  As of the time of Lynn's trial, the cases of Barbee v. Warden, 331 F.2d 842, 846 (4th Cir. 1964), Goodwin v. Metts, 885 F.2d 157, 162 (1989),  Jean v. Rice, 945 F.2d 82 (4th Cir. 1991), and Carter v. Burch, 34 F.3d 257, 264 (1994) established a police officer's duty under the Due Process Clause to disclosed exculpatory information to the prosecutor in a criminal case.  As this Court in Jean v.Collins, 155 F.3d 701, 710, n. 3 (4th Cir. 1998), observed: "The decisions in Taylor, Carter, and Goodwin now provide notice to police officers that they can be subject to monetary damages under section 1983 for failure to disclose exculpatory evidence to the prosecutor."

In their brief, the officers concede that Goodwin is "the only case that might be read to impose a duty on police officers to provide exculpatory or impeachment information to the prosecutors." Brief, p. 25.  They argue that "Goodwin does not

48

clearly establish a duty for the police to provide information to prosecutors other than confessions." (Emphasis added.)  Brief, p. 26.  It is absurd to argue that the holding in Goodwin is limited to "confessions."  Exculpatory evidence is exculpatory evidence.  Goodwin makes clear that "[a] police officer who withholds exculpatory evidence from the prosecutor can be liable under both section 193 and the state common law."  Id., 162. The difficulty the officers face is that it is hard to argue that the officers could read Goodwin and not understand that they had a duty to disclose their payments to Sandy during the homicide case to the prosecutor. The evidence was no less material to the question of guilt or innocense than the evidence which the officers withheld in Goodwin.

The officers argue that the legal claim before Goodwin was overruled by the Supreme Court in Albright v. Oliver, 510 U.S. 266 (1994).  In that case, the Supreme Court held that this is no substantive due process right "to be free of criminal prosecution except on probable cause." In Taylor v. Waters, 81 F.3d 429, 436, n. 5 (4th Cir. 1996), the Court held:

> To the extent that Goodwin based its holding on a conclusion that the officer's failure to disclose exculpatory evidence deprived the § 1983 plaintiffs of a liberty interest in avoiding prosecution on less than probable cause, that reasoning has been rejected in Albright. ... But, to the extent that Goodwin deprived the § 1983 plaintiffs of their right to a fair trial, its holding is not affected by Albright.

49

Taylor's construction of Goodwin is justified.  In Goodwin, the plaintiffs were put through a trial in which they did not have the benefit of patently exculpatory evidence which was caused by the officer who had withheld from the prosecutor.  The legal claim made in Goodwin was "wrongful prosecution,"  in that had the officers turned over the exculpatory evidence to the prosecutor they would not have been prosecuted.  However, like Lynn, the plaintiffs in Goodwin were subjected to a trial in which they had been deprived of exculpatory evidence improperly withheld by the police from the prosecutor.  This is why the Court in Taylor was readily able to construe Goodwin as one implicating the § 1983 plaintiffs' right to a fair trial.

The officers cite to an unpublished decision of Walker v. Sopher, 1998 U.S. App. LEXIS 23712 (4th Cir. 1998) to cast doubt on Goodwin.  Under Local Rule 32.1, citation of this Court's unpublished opinions "is disfavored, except for the purpose of establishing res judicata, estoppel, or the law of the case."  The officers have not cited the case for any of these purposes.  The rule allows citation to an unpublished case if a party believes that it has precedential value and "there is no published opinion that would serve as well." There is a published opinion which serves as well.  With to Goodwin's capacity to provide notice to the officers of their

50

duty with respect to exculpatory evidence, Jean v. Collins, 155 F.3d 701 (4th Cir.

1998)(en banc), vacated and remanded, 526 U.S. 1142 (1999), stated:

> More recently this circuit has recognized that the failure of police
> officers to turn over exculpatory evidence to a prosecutor may violate a
> criminal defendant's constitutional right to receive such evidence. See,
> Taylor v. Waters, 81 F.3d 429, 436 n. 5 (4th Cir. 1996); Carter [v.
> Burch], 34 F.3d at 264; Goodwin v. Metts, 885 F.2d 157, 162-63 (4th
> Cir. 1989), overruled in part by Albright v. Oliver, 510 U.S. 266
> (1994).  Contrary to Judge Hamilton's claim that the majority fails to
> explain what it means by proper notice, the decisions in Taylor, Carter
> and Goodwin now provide notice to police officers that they can be
> subject to monetary damages under section 1983 for failure to disclose
> exculpatory evidence to the prosecutor.

(Emphasis added.)  A much more positive statement of Goodwin's validity to

provide notice to police officers cannot be made, and therefore the unpublished

opinion should have been cited.

Finally, the officers ignore this Court's holding in Carter v. Burch, 34 F.3d

257 (4th Cir. 1994).  As just mentioned, this case, too, gave the officers notice that

they can be subject to damages under § 1983 for failure to disclose exculpatory

evidence.  Carter was decided September 9, 1994, almost three months before

Lynn's trial, which was on November 28, 1994. Carter was found guilty of

malicious wounding of his ex-wife. The prosecution's case was that Carter shot his

ex-wife in the middle of the night during a struggle.  Carter denied the charge and

asserted an alibi defense that he was in another state at the time of the offense.  He

also argued that his ex-wife was emotionally unstable and may have attempted to

shoot herself.  Carter was convicted and given a 14 year sentence. Three years later,

Carter was released on a writ of habeus corpus.  His release was brought about by

the discovery of exculpatory evidence.  The evidence came from deputy sheriff,

Poppa, who had interviewed with Carter's ex-wife for a position as a security guard.

Poppa testified that the ex-wife spoke to him about how much she hated her ex-

husband and that she would be willing to shoot herself and make it look like he did

it so that he would spend the rest of his life in jail.  During the interview, the ex-

wife showed Poppa the gun which later Carter allegedly used to shoot his wife.

Poppa told the investigating officer Beamer about the ex-wife's statements, but

Beamer did not disclose them to the prosecutor.  Carter was acquitted after a new

trial.  He brought suit under § 1983 alleging that Beamer had withheld exculpatory

evidence. He recovered a judgment against Beamer for nominal damages.  On

appeal, Carter objected to the jury's verdict in light of uncontested special damages

from four years spent in prison.  The Court ruled against Carter on this issue

because acknowledged that the evidence was sufficient to show that Beamer

violated Carter's constitutional rights.  Id., 264.  Thus, Carter v. Burch also

provided clear notice to the officers, prior to Lynn's trial when they could have

provided exculpatory evidence to Boynton, that they could be liable for withholding

exculpatory evidence from the prosecutor.

## IV.   CONCLUSION

Based upon the foregoing, the Court should affirm the judgment of the

district court.

/s/ Terrell N. Roberts, III
Terrell N. Roberts, III., Esq.
Attorney for Plaintiffs
6801 Kenilworth Avenue, #202
Riverdale, MD 20737
(301) 699-0764


/s/ Christopher A. Griffiths
Christopher A. Griffiths, Esq.
Attorney for Plaintiffs
6801 Kenilworth Avenue, #202
Riverdale, MD 20737
(301) 699-0764

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)
Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.    This brief complies with the type-volume limitation of Fed. R. App. P.
      32(a)(7)(B) because:

            this brief contains <u>12,712</u> words, excluding the parts of the brief
            exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P.
      32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6)
      because:

            this brief has been prepared in a proportionally spaced typeface using
            <u>14 Point Times New Roman</u> in <u>WordPerfect 12</u>.


                                     <u>  /s/ Terrell N. Roberts, III  </u>
                                         Counsel for Appellee
                                         Dated: April 12, 2010

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on April 12, 2010 I electronically filed the foregoing

brief with the Clerk of Court using the CM/ECF System, which will send notice of

such filing to the following registered CM/ECF user:

Silvia C. Kinch
Office of the County Attorney
Montgomery County, Maryland
1301 Piccard Drive
Fourth Floor
Rockville, MD 20850

Edward B. Lattner
Patricia Prestigiacomo Via
County Attorney's Office
Executive Office Building
101 Monroe Street
Third Floor
Rockville, MD 20850
Charleston, WV 25326-1588

*Counsel for Appellants*

The necessary filing and service were performed in accordance with the

instructions given to me by counsel in this case.

 /s/ Carly A. Ramey
Carly A. Ramey
Gibson Moore Appellate Services, LLC
421 East Franklin Street, Suite 230
Richmond, VA  23219